**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

**McGUIREWOODS LLP**
David S. Reidy (SBN 225904)

2
dreidy@mcguirewoods.com
Two Embarcadero Center, Suite 1300

3
San Francisco, CA 94111
Telephone: 415.844.9944

4
Facsimile: 415.844.9922

5

Bethany G. Lukitsch (SBN 314376)

6
800 East Canal Street
Richmond, Virginia 23219-3916

7
Telephone: 804.775.4711
Facsimile: 804.698.2261

8
blukitsch@mcguirewoods.com

9

Diane P. Flannery (Pro Hac Vice)

10
800 East Canal Street
Richmond, Virginia 23219-3916

11
Telephone: 804.775.1015
Facsimile: 804.698.2047

12
dflannery@mcguirewoods.com

13

Attorneys for Defendant Lumber Liquidators, Inc.

14

UNITED STATES DISTRICT COURT

15

NORTHERN DISTRICT OF CALIFORNIA

16

DANA GOLD, TAMMY EMERY, EDWIN

17
MENDEZ, LAURA NORRIS, DONALD
FURSMAN, and JOHN TRIANA, on behalf

18
of themselves and all others similarly situated,

19

Plaintiffs,

20

vs.

21

LUMBER LIQUIDATORS, INC., a Delaware

22
corporation; and DOES 1 through 200,

23
inclusive,

24

Defendants.

25

26

27

28

CASE NO. 3:14-cv-05373-TEH

**DEFENDANT LUMBER LIQUIDATORS'
NOTICE OF MOTION, MOTION TO
EXCLUDE PLAINTIFFS' EXPERT
WITNESSES, AND MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION**

<u>CLASS ACTION</u>

JURY TRIAL DEMAND

The Honorable Thelton E. Henderson

Complaint Filed: December 8, 2014

Hearing Date: May 22, 2017

Time: 10:00 a.m.

1

2

**NOTICE OF MOTION AND MOTION**

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

3    **PLEASE TAKE NOTICE THAT** on May 22, 2017, at 10:00 a.m. or as soon thereafter as

4  the matter may be heard in the United States District Court, Northern District of California, San

5  Francisco Division, located at 450 Golden Gate Avenue, San Francisco, CA 94102, before the

6  Honorable Thelton E. Henderson, in Courtroom 2, 17th Floor, Defendant Lumber Liquidators,

7  Inc. ("Lumber Liquidators") will, and hereby does, move to exclude Plaintiffs' expert witnesses,

8  Peter Nelson, Emily Hopps, Phillip Waier, and Daniel Harrington, pursuant to Fed. R. Evid. 702,

9  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S.

10  137 (1999), and related authorities.

11    This motion is based upon this Notice of Motion and Motion, the accompanying

12  Memorandum of Points and Authorities in Support of this Motion, the Declaration of Bethany G.

13  Lukitsch and other exhibits filed in support, and such other written and oral argument as may be

14  presented to the Court.

15  Dated: April 14, 2017                Respectfully Submitted,

16                    By:   /s/ Bethany G. Lukitsch
                             Bethany G. Lukitsch
17                             Attorney for Lumber Liquidators, Inc.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     Introduction ........................................................................................................... 1

II.    Plaintiffs' Allegations ........................................................................................ 2

III.   Argument and Authority ................................................................................... 3

    A)     Legal Standard ......................................................................................... 3

    B)     Daniel Harrington ................................................................................... 5

          1.     Mr. Harrington lacks the education, qualifications, and experience to testify as an expert witness........................................................................... 6

          2.     Mr. Harrington's opinion is inherently unreliable ....................................... 8

          3.     Mr. Harrington's opinions are not credible ................................................ 10

    C)     Phillip Waier ........................................................................................ 11

          1.     Mr. Waier's opinion is not relevant to whether the classes' actual damages may be demonstrated with a common model or proof .............. 12

          2.     Mr. Waier's opinion is not founded upon sufficient data ........................ 13

    D)     Peter Nelson and Emily Hopps .............................................................. 15

          1.     Nelson and Hopps' sampling and testing methodologies are anecdotal, flawed, and highly speculative................................................ 16

              i.     Nelson and Hopps' sampling methodology is anecdotal and flawed ............................................................................... 17

              ii.   Nelson and Hopps' testing methodology is fatally flawed ................. 19

          1.     Nelson and Hopps' analysis of the complaint database is flawed because this data has a high known error rate, and they failed to compare their results to the total population sold, leaving it meaningless ........................................................................................ 21

          2.     Nelson and Hopps' "company knowledge" opinion is speculative and not based in fact................................................................................. 23

CONCLUSION .................................................................................................................. 24

i

LUMBER LIQUIDATORS' NOTICE OF MOTION, MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES,
AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT - CASE NO. 3:14-CV-05373-TEH

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Estate of Barabin v. AstenJohnson, Inc.*,
    740 F.3d 457 (9th Cir. 2014)...........................................................................4, 8

5

6

*Bogosian v. Mercedes-Benz of N. Am., Inc.*,
    104 F.3d 472 (1st Cir. 1997) ...............................................................................20

7

8

*Brazil v. Dole Packaged Foods, LLC*,
    660 F. App'x 531 (9th Cir. 2016).........................................................................11

9

*Brown v. China Integrated Energy, Inc.*,
    No. CV 11-02559 BRO, 2015 U.S. Dist. LEXIS 19177 (C.D. Cal. Feb. 17,
    2015)......................................................................................................................10

10

11

*Bunker v. Ford Motor Co.*,
    640 F. App'x 661 (9th Cir. 2016) (unpub.) ..........................................................7

12

13

*Cabrera v. Cordis Corp.*,
    134 F.3d 1418 (9th Cir. 1998).........................................................................5, 10

14

15

*Casey v. Ohio Med'l Prods.*,
    877 F. Supp. 1380 (N.D. Cal. 1995) ...................................................................17

16

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014).................................................................4, 5, 8, 14

17

18

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007)..................................................................................5

19

20

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995)................................................................................15

21

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ...................................................................................... *passim*

22

23

*Doyle v. Chrysler Grp., LLC*,
    663 F. App'x 576 (9th Cir. 2016).....................................................................11, 14

24

25

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)................................................................................14

26

*In re Fosamax Products Liability Litigation*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...........................................................23, 24

27

28

*Gross v. King David Bistro, Inc.*,
    83 F. Supp. 2d 597 (D. Md. 2000) ...........................................................................17

*Hershey Foods Corp. v. Waterman S.S Corp.*,
    No. 82 CIV. 0533 (DNE), 1994 WL 281929 (S.D.N.Y. June 22, 1994) *aff'd sub*
    *nom. Hershey Foods Corp. v. Waterman S.S. Corp.*, 43 F.3d 1458 (2d Cir.
    1994)).....................................................................................................................19

*Jones v. United States*,
    933 F. Supp. 894 (N.D. Cal. 1996), *aff'd,* 127 F.3d 1154 (9th Cir. 1997)................17

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...............................................................................1, 4, 5

*Luviano v. Multi Cable, Inc.*,
    No. CV 15-05592 BRO (FFM), 2017 U.S. Dist. LEXIS 32349 (C.D. Cal. Jan.
    3, 2017)....................................................................................................................6

*Nelson v. Am. Home Prods. Corp.*,
    92 F. Supp. 2d 954 (W.D. Mo. 2000)........................................................................16

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
    676 F.3d 521 (6th Cir. 2012)....................................................................................17

*Senne v. Kansas City Royals Baseball Corp*,
    315 F.R.D. 523 (N.D. Cal. 2016) ..............................................................................4

*Thomas v. Newton Int'l Enters.*,
    42 F.3d 1266 (9th Cir. 1994)....................................................................................6

*Tyree v. Boston Sci. Corp.*,
    54 F. Supp. 3d 501 (S.D.W. Va. 2014), *as amended* (Oct. 29, 2014)........................19

*U.S. v. Downing*,
    753 F.2d 1224 (1985) ...............................................................................................4

**Rules**

Fed. R. Evid. 608................................................................................................................10

Fed. R. Evid. 702................................................................................................... *passim*

Fed. R. Evid. 702(a) ..........................................................................................................13

Fed. R. Evid. 702(c), (d).....................................................................................................15

1    Defendant Lumber Liquidators, Inc. ("Lumber Liquidators"), through undersigned

2    counsel, hereby submits this Memorandum in support of its Motion to Exclude Plaintiffs' Expert

3    Witnesses, Daniel Harrington, Phillip Waier, Peter Nelson, and Emily Hopps, pursuant to Fed. R.

4    Evid. 702, *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*,

5    526 U.S. 137 (1999), and related cases.  Lumber Liquidators requests that this Court grant its

6    motion to exclude Plaintiffs' expert witnesses in its entirety, enter the Proposed Order filed

7    concurrently herewith, and grant such other and further relief as the Court deems appropriate.

8    **I.      Introduction.**

9    In their motion for class certification, Plaintiffs allege that Lumber Liquidators sold them a

10   defective Morning Star bamboo flooring product that is "unable to stand up to normal variations in

11   a home's ambient moisture levels," causing the flooring to exhibit conditions such as cupping,

12   warping, shrinking, gapping, and splintering.  (Pls.' Mot. for Class Cert. at 1, Doc. 111.)  In

13   support of their motion, Plaintiffs cite to a report ("SGH Report") by Peter E. Nelson and Emily R.

14   Hopps from the engineering firm Simpson Gumpertz & Heger ("SGH"), which concludes, based

15   on testing performed solely in SGH's laboratory, that Morning Star bamboo flooring sold by

16   Lumber Liquidators is uniformly defective.  (SGH Report, Ex. 14 to Pls.' Mot. for Class Cert,

17   Doc. 112-15.)

18   In addition, Plaintiffs identified two expert witnesses, Daniel Harrington and Phillip Waier,

19   who collectively opine regarding potential damages.  (Harrington Decl., Doc. 115; Waier Decl.,

20   Doc. 114.)  Mr. Harrington opines, without *ever* inspecting a single bamboo floor, that each and

21   every putative class member will have to have his or her floor completely replaced, while Mr.

22   Waier promises to calculate the cost of removal and replacement for each such class member *at*

23   *some future point* in time, without actually providing any data or model to support Plaintiffs' class

24   certification efforts.  (Harrington Decl. ¶ 18; Waier Decl. ¶ 8.)

25   Because each of the opinions offered are inherently speculative and based on nonexistent

26   or deficient methodologies, Plaintiffs cannot demonstrate that their experts are qualified to offer

27   reliable opinion testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow*

28   *Pharms.*, 509 U.S. 579, 597 (1993).  Accordingly, as discussed in further detail herein, the

2

LUMBER LIQUIDATORS' NOTICE OF MOTION, MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES,
AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT - CASE NO. 3:14-CV-05373-TEH

1  opinions and evidence offered by Mr. Harrington, Mr. Waier, Mr. Nelson, and Ms. Hopps must be

2  excluded.

3  **II.      Plaintiffs' Allegations.**

4          On January 20, 2016, Plaintiffs Dana Gold, Tammy Emery, Edwin Mendez, Christopher

5  Massaro,[1] Laura Norris, Donald Fursman, and John Triana filed their Third Amended Class

6  Action Complaint ("Complaint" or "Compl."), generally alleging that the Morning Star bamboo

7  Flooring they purchased from Lumber Liquidators was "subject to premature cracking, splitting,

8  warping, and shrinking . . . before the warranted useful life."  (Compl. ¶ 3, Doc. 63.)  Plaintiffs

9  seek prospective and, in the case of Mr. Mendez, actual damages associated with the repair and

10  replacement of their flooring.

11          Ms. Gold specifically complains of "warping, splitting, buckling, and shrinking" (*id.*, ¶ 27)

12  and testified that her floor expands and contracts throughout the year, causing gaps that get bigger

13  when the weather changes.  (Ex. 1 at 77:25-78:6; 117:2-18:20.)  Ms. Gold does not allege that her

14  floor has cupped.  (Compl. ¶ 27.)  She wants Lumber Liquidators to pay to have her floor removed

15  and replaced.  (Ex. 1 at 315:15-320:5.)

16          Ms. Emery alleges that her floor was "delaminating, warping, splitting, shrinking, and

17  scratching, and generally deteriorating in various places."  (Compl. ¶ 39.)   While she is still

18  allegedly experiencing shrinking and gapping, she testified at her deposition that the warping issue

19  was resolved after she hired someone to remove and replace the single board which exhibited that

20  issue.  (Ex. 2 at 33:17-24, 72:6-18, 77:15-80:18.)  She could not testify with certainty that she was

21  experiencing cupping.  (*Id.* at 78:15-24.)   When asked, she responded: "some of the boards

22  actually do look like they are coming up and like not laying flat, just a little tiny bit at an edge, so,

23  yes."  (*Id.*)  She wants a full refund for the flooring, including installation expenses, and, maybe,

24  "the price to tear it out."  (*Id.* at 100:16-101:2, 152:8-24.)

25  _____

26      [1] Christopher Massaro was voluntarily dismissed on September 26, 2016.  *See* Stipulation
of Dismissal Re: Plaintiff Christopher Massaro, September 26, 2016, Doc. 86.

27

28

Mr. Fursman complains that his floor is "excessively shrinking . . . [and] creat[ing] large gaps" (Compl. ¶ 93), but denied at his deposition that this issue could be characterized as "gapping." (Ex. 3 at 42:20-43:1.)  He was unable to say whether he is claiming that his floor has cupped, delaminated, or peeled. (*Id.* at 113:1-114:25.)  He is seeking the costs associated with the removal and replacement of the flooring. (*Id.* at 206:22-208:3.)

Ms. Norris alleges that her floor is "cupping, shrinking, warping, and splitting" (Compl. ¶ 74) and testified that she experiences gapping along the perimeter, which shrinks somewhat during the summer months. (Ex. 4 at 71:8-73:1.)  She is looking to recoup the cost of removing and replacing her existing floor, "reimbursement for [her] installer who had to do the reinstall, those kinds of expenses that have been incurred to maintain it." (*Id.* at 115:1-19.)

Mr. Mendez claims that his floor is "buckling and shrinking in several areas" (Compl. ¶ 53), which he characterized as "gapping" at his deposition. (Ex. 5 at 13:25-15:25.)  Due to an unrelated broken pipe, Mr. Mendez's insurance company already paid to have his flooring removed and replaced, but he is seeking to recover his $1,000 deductible, $1,205 in depreciation, lost time at work, and "anything else that the law allows for." (*Id.* at 191:20-193:5; 203:5-211:10.)

Finally, Mr. Triana complains that his floor is "cracking, splitting, peeling, and cupping." (Compl. ¶ 110).  He testified that he wants Lumber Liquidators to pay to remove and replace his flooring. (Ex. 6 at 172:17-173:7.)

Despite these widely varying complaints and speculation as to cause at deposition and in previous filings, Plaintiffs now assert for the first time in their class certification motion that the cause of the alleged defects is a uniform inability for all Morning Star bamboo floors to "stand up to normal variations in a home's ambient moisture levels." (*See* Pls.' Mot. for Class Cert. at 1.)

## III.    Argument and Authority.

### A)      Legal Standard.

Federal Rule of Evidence 702 allows a witness, properly qualified through "knowledge skill, experience, training, or education," to offer opinion testimony. Fed. R. Evid. 702.  The rule also "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). The Supreme Court has held that this "gatekeeper" principle espoused in *Daubert* likewise applies to non-scientific experts, like engineers, who intend to offer opinion testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

Once a witness has been qualified as an expert, *Daubert* requires trial courts to conduct a two-part analysis to determine whether that expert's opinion is admissible under Rule 702. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014); *see also Senne v. Kansas City Royals Baseball Corp*, 315 F.R.D. 523, 586 (N.D. Cal. 2016) ("When a party seeks to exclude expert testimony or reports at the class certification stage, courts apply the *Daubert* standard to evaluate the challenged evidence."). First, the expert's opinion must be relevant, *i.e.*, it must bear a "valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591-92. Under this requirement, expert testimony will be considered relevant if "the knowledge underlying it has a valid connection to the pertinent inquiry." *City of Pomona*, 750 F.3d at 1044; *see also U.S. v. Downing*, 753 F.2d 1224, 1237 (1985) (Rule 702 requires a "proffered connection between the scientific research or test result" and the "particular disputed factual issues in the case").

Under the second inquiry, reliability, "'[t]he court must assess the expert's reasoning or methodology" using a "flexible" test incorporating such criteria as "testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona*, 750 F.3d at 1044; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). Thus, the trial court must make a preliminary assessment of the scientific validity of the reasoning or methodology underlying the proposed testimony. *Daubert*, 509 U.S. at 592-93.

The fundamental objective of this gate-keeping requirement is "to make certain that an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. As a result, "reliability" requires that the expert derive his conclusions from accepted scientific protocol rather than merely the expert's own speculation or conjecture. *Daubert*, 509 U.S. at 590; *see also City of Pomona*, 750 F.3d at 1044 ("For scientific evidence to be admissible, the proponent must show the assertion is 'derived by

5

[a] scientific method.'  Opinion based on 'unsubstantiated and undocumented information is the antithesis of . . . scientifically reliable expert opinion." (*quoting Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (internal citations omitted))).  In making the reliability assessment, the trial court is not constrained to accept the expert's conclusions, but rather should exclude unfounded conclusions that are "connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157.

With respect to the first of the four factors, testability, the Ninth Circuit has held that "scientific methods that are subject to 'further testing and refinement' may be generally accepted and sufficiently reliable" because, as *Daubert* instructs, "[t]here are no certainties in science." *City of Pomona*, 750 F.3d at 1044 (*quoting Daubert*, 509 U.S. at 590).  There must be evidence, however, "indicating the methodology 'can be or has been tested.'" *Id.* at 1046 (*quoting Cooper v. Brown*, 510 F.3d 870, 880-81 (9th Cir. 2007)).  Elaborating on this concept, the Ninth Circuit explained: "The question is whether an expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *Id.* (*quoting* Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments).  Plaintiffs' experts' opinions cannot survive this analysis.

## B)   Daniel Harrington.

Plaintiffs' expert Daniel "Danny" Harrington is an executive at Galleher Corporation, "one of the largest wholesale wood flooring distributors in the United States" (Harrington Decl. ¶ 10) and a direct competitor of Lumber Liquidators.  (Ex. 7 at 254:17-20, 256:15-17.)  Though he has not inspected a single plank of the Plaintiffs' flooring in this case and has never inspected or installed *any* floor for compensation throughout his entire career (*id*. at 315:13-316:23), Mr. Harrington intends to testify that in "virtually all of the cases, in order to repair a floor that exhibits [warping, separation, shrinkage and cupping], the entire floor must be removed." (Harrington Decl. ¶¶ 15, 17.)  This is essentially Mr. Harrington's only opinion, and Plaintiffs use it to support their assertion that all class members are entitled to recover the full cost of removing and replacing the bamboo flooring from their homes as actual damages.  (*See* Pls.' Mot. for Class Cert. at 18.)  Mr. Harrington should not be permitted to offer this opinion, however, because (i) he

6

LUMBER LIQUIDATORS' NOTICE OF MOTION, MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES,
AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT - CASE NO. 3:14-CV-05373-TEH

lacks the necessary education, training, skills or experience to testify as an expert in this area, and (ii) his opinion is not based upon any discernible methodology, making it inherently unreliable.  In addition, Mr. Harrington's inherent bias prevents him from being a credible witness and casts further doubt on the reliability of his opinions.

### 1. Mr. Harrington lacks the education, qualifications, and experience to testify as an expert witness.

Under Rule 702 of the Federal Rules of Evidence, an expert witness must first be qualified to testify regarding a particular subject matter based on his or her "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Otherwise, the expert's testimony will not assist the trier of fact to "understand the evidence or determine a fact in issue."  *Id.*  Even under Rule 702's "broad conception of expert qualifications," however, Mr. Harrington's education, training, and experience fall far short.  *Luviano v. Multi Cable, Inc.*, No. CV 15-05592 BRO (FFM), 2017 U.S. Dist. LEXIS 32349, at * 26 (C.D. Cal. Jan. 3, 2017) (*quoting Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)).

Though Mr. Harrington believes he has a "scientific mind," he admits to having no formal scientific training and acknowledges he is not a scientist.  (Ex. 7 at 227:2-7.)  He obtained a bachelor's degree in political science from the University of San Diego in 1996 and subsequently took a course on leadership development and training.  (*Id.* at 217:14-20.)  After graduating from college, Mr. Harrington worked in the restaurant management and nightclub industry for a time, then got a job working for the California State prison system.  (*Id.* at 217:23-221:11.)  In 2001, he began working in sales and marketing in the lumber supply and flooring industry.  (*Id.* at 222:16-23; Ex. 8 at 2-3.)  He joined Galleher Corporation in 2012 and is now Vice President of Marketing & Product Development.  (Ex. 8 at 1.)

Mr. Harrington is not a certified wood floor installer, nor has he been certified as a residential or commercial wood flooring inspector.  (Ex. 7 at 235:24-236:7.)  He does not hold any certificates from the National Wood Flooring Association.  (*Id.* at 235:8-11.)  Though Mr. Harrington claims to base his opinion on his personal "involve[ment] in repairs of Bamboo floors" that "manifest warping, separation, shrinkage and cupping" (Harrington Decl. ¶¶ 15, 16), he

7

LUMBER LIQUIDATORS' NOTICE OF MOTION, MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES, AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT - CASE NO. 3:14-CV-05373-TEH

admitted in his deposition that he has never *supervised* the replacement of a bamboo floor which manifested those conditions, let alone personally replaced such a floor.  (Ex. 7 at 315:17-316:23.) He testified:

> Q:  Okay . . . let me make sure I understand this.  You have never personally replaced a bamboo floor that manifested warping, separation, shrinkage and cupping, correct?
>
> A:  Correct, not with my own hands.
>
> *  *  *  *  *
>
> Q:  Okay.  So getting back to my original question: You have not personally supervised a crew that was removing a bamboo floor that manifested warping, separation, shrinking, and cupping?
>
> A:  Correct.

(*Id.*)  Mr. Harrington has never been hired to *inspect* a floor either.  (*Id.* at 238:13-15.)  He has never installed a wood floor for hire, and has only personally installed a wood, not bamboo, floor "six or seven times" in "various homes that [he has] owned or rented over the years."  (*Id.* at 237:23-238:6.)  Accordingly, he simply does not have the education, training, skills, knowledge, or experience necessary to testify as an expert regarding the installation and/or replacement of Plaintiffs' flooring.

In *Bunker v. Ford Motor Co.*, 640 F. App'x 661 (9th Cir. 2016) (unpub.), the Ninth Circuit affirmed the exclusion of the plaintiff's expert witness under similar circumstances.  There, the expert witness, Thomas Lepper, opined that the plaintiff's 2007 Ford truck was defectively designed because the truck's "brake shift interlock system allowed the transmission to be shifted out of park without someone applying pressure to the brake pedal."  *Id.* at 662.  At his deposition, however, he admitted that he did not know the history of brake shift interlock systems and had never previously been retained to testify about such systems specifically, though he had previously testified about "transmission issues" generally.  *Id.*  Mr. Lepper further conceded that he did not conduct any type of survey to determine whether other automobile manufacturers employed similar brake shift interlock systems in their vehicles.  *Id.*  Finding that Mr. Lepper had "virtually no familiarity with brake shift interlock systems," the Ninth Circuit affirmed the exclusion of his testimony.

8

1   The Court should reach the same conclusion here.  Though Mr. Harrington might be

2   qualified as an expert regarding issues involving the supply, sourcing, sales, and marketing of

3   wood flooring products, this general experience in the flooring industry does not translate to an

4   expertise in the remediation and/or removal of bamboo flooring due to alleged cupping, warping,

5   separation, or shrinkage issues.

6   **2. Mr. Harrington's opinion is inherently unreliable.**

7   As outlined earlier, the reliability of an expert's opinion is established by assessing his or

8   her methodology using a "flexible" test which evaluates: (i) whether the expert's methods can be

9   tested, (ii) whether they have been published in peer-reviewed literature, (iii) the known or

10   potential error rate of the expert's methods, and (iv) whether the expert's methods have been

11   generally accepted in the field.  *City of Pomona*, 750 F.3d at 1044; *see also Estate of Barabin*, 740

12   F.3d at 463.  Mr. Harrington's "opinion" fails each of these prongs.

13   Mr. Harrington's opinion that any bamboo flooring that exhibits warping, separation,

14   shrinkage or cupping must be entirely removed is easy to evaluate because there is no apparent

15   methodology underlying it at all.  (Harrington Decl. ¶¶ 15, 17; Ex. 7 at 319:12-320:12.)  Because

16   Mr. Harrington has no personal experience installing, inspecting, and replacing bamboo floors, he

17   instead pads his opinions with vague memories from his past and anecdotal stories from a handful

18   of independent claims investigators and installers who have contacted him for advice over the

19   years, some of whom provided him with inspection reports.   (Ex. 7 at 40:17-42:20.)   Mr.

20   Harrington did not keep records regarding these consultations.  They are just "recollections."

21   When asked where the reports were, he replied: "In long-since deleted emails, most of them."  (*Id.*

22   at 42:17-20.)  Mr. Harrington did not adhere to any set of standards while evaluating these reports

23   either.  Instead, he merely accepted the reports' conclusions based on his impression that the

24   installers were "being very careful."  (*Id.* at 39:14-21.)

25   The same is true with respect to the flooring at issue in this case.  Not only has he has not

26   inspected any named Plaintiffs' flooring, he has not even reviewed any *photographs* of such

27   flooring.   (*Id.* at 213:1-216:14.)   Accordingly, Mr. Harrington cannot independently verify

28   whether any of the installations at issue affect one board, ten boards, or the entire house of

9

1    flooring.  Again, he simply assumes a 100% defective floor and has no basis to opine that the

2    entire floor must be replaced regardless of the different conditions alleged.

3        This "methodology" is not scientific, is not verifiable, and is not repeatable, particularly

4    where the reports at issue no longer exist.  It also directly contradicts the evidence in this case.

5    For example, Plaintiff Tammy Emery testified that after her installer replaced a single warped

6    board in her home, she has not had a problem with warping since.  (*See* Ex. 2 at 33:17-24, 72:6-

7    18.)  Mr. Harrington's opinion that in "*virtually* all of the cases . . . the entire floor must be

8    removed" also fails to define the exception to the rule it pronounces – under what circumstances

9    would a floor *not* need to be entirely replaced?  (Harrington Decl. ¶¶ 15, 17 (emphasis added).)

10   Mr. Harrington never lets us know.

11       Mr. Harrington's "method" of evaluating flooring claims has never been published in any

12   peer-reviewed literature or otherwise been subject to academic critique.  Though Mr. Harrington's

13   article, *Beyond Bamboo Basics*, was published in the magazine *Hardwood Floors* in 2012,[2]

14   *Hardwood Floors* is a trade publication – not a scientific journal.  (Ex. 9.)  This article is limited

15   to a general discussion of bamboo's biological structure, the construction of bamboo flooring, and

16   related concepts.  (*Id.*)  The article does not mention Morning Star bamboo floors, and does not

17   address the remediation of bamboo floors in any context, let alone floors which exhibit the specific

18   conditions complained of by Plaintiffs here.  (*Id.*)  It does acknowledge, however, that installing

19   bamboo flooring is difficult in that the recommended installation techniques deviate from those

20   used with traditional hardwood flooring.  (*Id.* at 42.)  The article further instructs that an

21   improperly installed bamboo floor can lead to cupping, gapping, and rippling.  (*Id.* at 42-43.)  This

22   disclosure is problematic for plaintiffs given Mr. Harrington's failure to independently verify that

23   any of the installations performed in this case (or in any of the third party claims he reviewed in

24   the past) were done correctly.

25   _____

26   [2] This article is also available online at http://galleher.com/wp-content/uploads/test/Dan-
     Harrington-Article-JFM8.12.pdf, last accessed on April 13, 2017.

27

28

Mr. Harrington did not create any data, conduct any research, perform any testing, and has no sampling technique.    By contrast, Lumber Liquidators' flooring expert, Richard Kass, personally inspected the flooring in each named Plaintiffs' home (with the exception of Edward Mendez, whose flooring was removed before this lawsuit was filed), measured the moisture content in the residences, measured the length of individual planks, measured the degrees of the alleged cupping, and documented his findings with photographs.  (Ex. 10.)

Opinion based on "unsubstantiated and undocumented information is the antithesis of  . . . scientifically reliable expert opinion."  *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998).  Because Mr. Harrington's opinion is not based upon any discernible methodology, cannot be tested, has not been peer-reviewed, and is based entirely upon speculation, it must be excluded.

### 3.  Mr. Harrington's opinions are not credible.

Finally, the Court may – and should – consider Mr. Harrington's bias in evaluating his credibility under Fed. R. Evid. 608 at the class certification stage.  Though there is no requirement in Rule 702 that an expert witness be unbiased, where, as here, "the expert's testimony is pertinent to an issue of law – whether to certify Plaintiffs' class – the Court will consider [the expert's] alleged bias in evaluating his credibility . . . ."  *Brown v. China Integrated Energy, Inc.*, No. CV 11-02559 BRO (PLAx), 2015 U.S. Dist. LEXIS 19177, at *18 (C.D. Cal. Feb. 17, 2015).

Mr. Harrington's current employer, Galleher Corporation, is a direct competitor of Lumber Liquidators.  Horizontal and vertical bamboo strand flooring manufactured by Reward Bamboo Planks is advertised on Galleher's website (*see* http://galleher.com/flooring/, last accessed on April 13, 2017), and Mr. Harrington testified that this product is available for purchase and installation nationwide (Ex. 7 at 50:5-20).   At his deposition, Mr. Harrington attempted to distinguish Galleher customers from Lumber Liquidators customers in that the latter are "bargain hunters" while the former are "searching for a full-service package."  (*Id.* at 254:21-255:20.)  He did acknowledge, however, that the two companies are "indirect[]" competitors and agreed that there is an overlap in the market.  (*Id.* at 254:17-20, 256:15-17.)

Mr. Harrington testified that he contacted Plaintiffs' counsel and volunteered himself as an expert based on a purported "moral obligation to participate" in the lawsuit because "so few

11

1   people . . . are knowledgeable about bamboo in the U.S." (*Id.* at 259:3-10.)  He further admitted

2   that, going forward, his compensation at Galleher will include an incentive-based component that

3   will be related to sales data.  (*Id.* at 251:11-253:25).  In other words, both Galleher, as a company,

4   and Mr. Harrington, individually, are poised to receive a financial windfall should Lumber

5   Liquidators become the target of further negative publicity, go out of business, or suffer a

6   judgment.  Mr. Harrington should not be permitted to assist in that endeavor.

7       **C)    Phillip Waier.**

8       Plaintiffs seek "actual damages" "consist[ing] of the purchase price and the cost of

9   removing [all Morning Star bamboo] flooring from [the] homes" of all who purchased it in

10  California, Illinois, Minnesota, Pennsylvania and West Virginia, from 2008 to the present.[3]  (Pls.'

11  Mot. for Class Cert. at 1, 18, 21, 22, 23, 24.)  But Plaintiffs offer no "common methodology for

12  calculating damages," *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016), and do

13  not show how these damages may "be calculated with proof common to the class," *Brazil v. Dole*

14  *Packaged Foods, LLC*, 660 F. App'x 531, 535 (9th Cir. 2016), and so falter on predominance.  *See*

15  *Comcast*, 133 S. Ct. at 1433.

16      In a thin attempt to support class certification, Plaintiffs offer the declaration of Phillip R.

17  Waier, a consultant for RSMeans Company.  (Waier Decl. at ¶¶ 1, 2, Doc. 114.)  Mr. Waier's two-

18  page declaration was hastily prepared in early February days before Plaintiffs' class certification

19  deadline to pitch "how [Mr. Waier] would make a cost estimate" for bamboo flooring removal and

20  replacement, *if requested*.  (Ex. 11 at 15:1‑17, 19:2-15, 22:22-23:21, 147:13-148:7.)  A damages

21  model was such an afterthought, Waier's engagement letter recites that Lumber Liquidators was

22  the retaining firm's client.  (Ex. 12.)  Lumber Liquidators has since conducted Waier's deposition

23  and reviewed his sole reliance materials, the RSMeans Published Construction Cost Data (the

24

25  ───────────────

26      [3] Plaintiffs only seek the flooring's purchase price for the Florida class.  (Pls.' Mot. for
    Class Cert. at 19.)

27

28

"Manual").  These reveal that no damages model exists and that Waier opined without knowledge of this case.

Waier declared that RSMeans' "consulting work includes the preparation of estimates for the removal and replacement of bamboo flooring and related materials for residential and light commercial construction."  (Waier Decl. ¶ 3.)  Mr. Waier corrected this statement in his deposition: it "can" include such work, no such work has been done.  (Ex. 11 at 114, 123:2-18.)  Waier also declared that the Manual, which he would reference to estimate the cost of such work, has data for "labor hours used for each task" involved in flooring removal and replacement. (Waier Decl. ¶ 6.)  Mr. Waier corrected this statement too: the Manual contains no information about the labor hours needed for removal of bamboo flooring of any type.  (Ex. 11 at 115:13-17, 131:10-17.)  Mr. Waier also declared that the Manual had been used in other cases to estimate "services relating to the cost of siding replacement" and "removal and replacement costs" (Waier Decl. ¶ 5), involving different product types and different tradespeople.  (*Id.* ¶ 7; Ex. 11 at 147:5-20.)  However, because RSMeans "published data is not location specific," he acknowledged that the Manual alone was not sufficient.   Additional research would be needed so that he could combine "the labor hour standards from the published data" "with location specific material cost and labor rate research to produce geographically specific estimates."  (Waier Decl. ¶¶ 6, 8; Ex. 11 at 129:4-131:5, 142:1-143:4, 148:3-18.)  And Waier conceded this was not something RSMeans or he had done, just something he proposes to attempt.  (Ex. 11 at 24:4-19, 89:10-22, 147:5-148:7, 149:16-150:9.)  Waier offered no more detail on what common methodology would be used to obtain location specific estimates for the putative classes, what research would be needed to "fill holes," or what common proof would result: "right now [he's] in the dark" on the facts.  (*Id.* at 148:8-18.)

## 1.   Mr. Waier's opinion is not relevant to whether the classes' actual damages may be demonstrated with a common model or proof.

Mr. Waier's opinion that "data" from various sources, some unknown, "can be used to calculate objectively the total cost of bamboo flooring removal and replacement on a geographically-specific basis" does not demonstrate that the damages sought by the class members

13

LUMBER LIQUIDATORS' NOTICE OF MOTION, MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES,
AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT - CASE NO. 3:14-CV-05373-TEH

can be shown by a common methodology or proof.  Accordingly, it is not "relevant" and not admissible.

First, Waier's opinion assumes that remediation would involve full floor removal and replacement (Waier Decl. ¶¶ 3, 4, 5, 7, 8), rather than partial removal or repair, without any basis for knowing which was needed by the Plaintiffs or appropriate here.  (Ex. 11 at 63:6-66:8, 89:2-90:15, 149:12-15.)  Like Harrington, Waier has not inspected a single Plaintiff's bamboo floor.  (*Id.* at 25:19-26:10.)  Despite this assumption, Waier offered no opinion regarding estimation of repair costs on a class-wide basis, despite knowing it was a possible remedy, (*id*. at 90:16-92:7), and that the cost and calculation of removal and replacement would differ from that of repair.  (*Id.* at 93:14-94:4.)  In addition, Plaintiffs' complaint seeks damages for the flooring's alleged cause of "potential[] damage[e to] other building elements, [including] continuous and progressive damage to property . . . ."  (Compl. ¶ 129.)  Waier's opinion does not address how he intends to calculate these site-specific damages on a class basis, much less calculate the remedy of repair class-wide.  Because Waier's opinions are not tantamount to a testable, concrete damages model, or even complete, they are unhelpful in determining predominance.  Fed. R. Evid. 702(a) (expert testimony must "help the trier of fact to . . . determine a fact in issue"); *see Comcast*, 133 S. Ct. at 1433.

### 2.      Mr. Waier's opinion is not founded upon sufficient data.

The only case-specific materials Waier has reviewed are the complaint and the protective order, provided mere days before offering his declaration.  (Ex. 11 at 15:15-17:15.)  Mr. Waier reviewed no materials from Plaintiffs' other experts, (*id.* at 17:6-15), nor any instructions on Morning Star installation, (*id.* at 25:9-14, 108:1-7), and knew nothing whatsoever about the Plaintiffs' properties (*id.* at 25:19-26:18).  Waier did not know what removal, replacement and/or repair would involve for the Plaintiffs, (*id.* at 58:16-59:3), or whether removal and replacement, rather than repair, was appropriate, (*id*. at 63:21-64:18, 65:21-66:8, 90:1-15).  He was "in the dark" on the type of bamboo floor at issue, what the replacement would be if replacement was necessary, and what percentage of sites would involve underlayment or base board.  (*Id.* at 20:12-22:14, 107:19-22, 130:6-131:9, 151:8-152:6, 155:13-156:11.)  Waier also claimed no knowledge

14

of whether the cost of removing and replacing Morning Star was the same as other types of flooring.  (*Id.* at 121:20-123:1.)  At Waier's deposition, it became apparent that he had opined without knowing whether the Manual, his sole source of data, had any on installation of click on glue down bamboo flooring, or any on removal and replacement of bamboo flooring specifically (it did not).  (*Id.* at 118:4-17, 123:19-124:19, 126:19-128.)  Waier likewise has no knowledge of Morning Star bamboo or what type of bamboo is at issue.  (*Id.* at 21:15-22:14, 107:19-22.)  In short, Waier's opinion rested on an evaluation of no data from, and no estimate of remediation for, this case (*id.* at 58:12-15, 114:14-22), as he had no facts (*id.* at 83:19-84:1, 131:6-9).

This defect is not remedied by Waier's experience.  An engineer by training (Waier Decl. ¶¶ 1, 2), Waier admitted that he has no professional experience in residential home construction or in "evaluating the total cost of removing bamboo flooring or replacing a bamboo floor."  (Ex. 11 at 79:5-80:6, 160:7-11.)  He is not a certified floor inspector or installer, having never installed, removed or inspected a floor professionally (*id.* at 101:11-16, 102:5-11, 125:20-126:9), or even estimated repair costs for a wood or bamboo floor (*id.* at 156:13-18, 159:10-20, 160:3-6).

Plaintiffs propose that this Court certify a six-state class involving more than 100,000 putative class members on the strength of an opinion formulated without knowledge or evaluation of this case's facts or of the steps needed in order to estimate various costs.  Lacking this, it is unsurprising that Waier offers no model by which the classes' damages will be calculated.  Waier's opinion is thus no more than an expert's *ipse dixit*, frustrating this Court's gatekeeping function, *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011), and nothing more than speculation.  *See Ollier*, 768 F.3d at 860 ("It is well settled that bare qualifications alone cannot establish the admissibility of ... expert testimony." (quotation marks omitted)).  Having offered *no model* for ascertaining class-wide damages, including "what percentage of the [putative classes' flooring]" must be removed, replaced, and/or repaired, Plaintiffs have not modeled "damages that are solely attributable to the theory of liability" or shown that they "could feasibly and efficiently be calculated."  *Doyle*, 663 F. App'x at 579.

This Court is thus left with no methodology to evaluate against the traditional factors meant to ensure scientific rigor, *see City of Pomona*, 750 F.3d at 1044, and no reason to conclude

15

1   that Mr. Waier's nascent approach to remediation estimation in this case will grow "naturally and

2   directly out of research [he] ha[d] conducted independent of . . . litigation" rather than "expressly

3   for purposes of testifying."   *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th

4   Cir. 1995).  Finally, given the absence of analysis and the affirmative evidence that Waier has *not*

5   considered the facts of this case, this Court cannot conclude that Waier's opinion "is the product

6   of reliable principles and methods" or that Waier "has reliably applied" them "to the facts of the

7   case." Fed. R. Evid. 702(c), (d).  These failures require exclusion.

8       **D)    Peter Nelson and Emily Hopps.**

9       Plaintiffs' experts Peter Nelson and Emily Hopps are principal engineers at SGH.  (*See*

10  Nelson and Hopps' Report (the "SGH Report"), Doc. 112-15.)  Plaintiffs allege, citing the SGH

11  Report, that "Morning Star made during the class period has a single, common and overarching

12  defect—the bamboo is unable to withstand typical and foreseeable residential ambient moisture:"

13      Ambient moisture arises from normal activities like cooking, showering, and breathing. *Id.*
        at 2, 36-37. The defect, which is moisture-induced and cyclic in nature results in (1)
14      swelling that causes buckling; and (2) drying that causes shrinkage and gapping.  Both
        conditions cause bulging and lifting that causes the flooring to fail or break, leaving the
15      flooring not durable or able to last the promised 30 years "in all typical applications." *Id*. at
        46-47.
16

17  (Pls.' Mot. for Class Cert. at 3 (citing to SGH Report).)

18      According to Nelson and Hopps, these defects are "reportedly common regardless of when,

19  where, or how the bamboo is installed."  (SGH Report at i.)  Nelson and Hopps further conclude

20  that the defects in Morning Star bamboo are "consistent among samples manufactured in different

21  facilities and during different time periods" for the entire population of Morning Star bamboo.

22  (*Id.* at 48.)

23      To reach their conclusion, Nelson and Hopps ███████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ██████████████████████████████████████

28  ███████████████████████████████████████████████

16

LUMBER LIQUIDATORS' NOTICE OF MOTION, MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES,
AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT - CASE NO. 3:14-CV-05373-TEH



As discussed below, these opinions are flawed, highly speculative and must be excluded.

**1. Nelson and Hopps' sampling and testing methodologies are anecdotal, flawed, and highly speculative.**

Expert opinions based on "anecdotal case studies" rely on information "that the scientific community regards as not reasonably reliable," and falls short of the *Daubert* standard. *Nelson v.*

17

1   *Am. Home Prods. Corp.*, 92 F. Supp. 2d 954, 972 (W.D. Mo. 2000); *see also Jones v. United*

2   *States*, 933 F. Supp. 894, 898 (N.D. Cal. 1996), *aff'd,* 127 F.3d 1154 (9th Cir. 1997); *Casey v.*

3   *Ohio Med'l Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) (compilation of anecdotal case

4   reports, in absence of study showing statistically significant result, fails to satisfy *Daubert*

5   inquiry).  Red flags that "caution against certifying an expert include reliance on anecdotal

6   evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and

7   subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

8   Where an expert's theory depends on "numerous logical shortcuts and inferential leaps," it is

9   "greatly suspect" and ultimately inadmissible. *Gross v. King David Bistro, Inc.*, 83 F. Supp. 2d

10  597, 599-600 (D. Md. 2000).

11          First, Nelson and Hopps relied on testing of an entirely anecdotal sample of Morning Star

12  bamboo flooring—███████████████████████████—to make the "improper

13  extrapolation" that *all* Morning Star bamboo flooring is defective. *Newell Rubbermaid, Inc.*, 676

14  F.3d at 527.  Second, Nelson and Hopps' testing methodology is fatally flawed. ████████

15  ████████████████████████████████████████████████████████

16  ████████████████   Accordingly, all of the results from their tests are inaccurate,

17  unreliable, and misleading.  Third, Nelson and Hopps' analysis of the complaint database is

18  flawed. ████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████   Nelson and Hopps'

24  deviation from established scientific protocols, highly speculative sampling and testing, and

25  reliance on a complaint database with a high known error rate renders their entire opinion

26  speculative and inadmissible under *Daubert*.

27                      **i.   Nelson and Hopps' sampling methodology is anecdotal and flawed.**

28          Lumber Liquidators sold over ████████████████████████████████████

1 ███████████████████████ (Def.'s Resp. to Pls.' Interrogatory No. 17(2), Doc. 112-2.)

2 In contrast, Nelson and Hopps ██████████████████████████████

3 ██████████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████████

6 ███████████████████████ Nelson and Hopps failed to consider whether their sample

7 size was large and representative enough to produce any reliable testing results.  Nelson and

8 Hopps did not know whether their 21 samples came from a total population of 20,000, 2 million,

9 or 200 million total units of Morning Star bamboo.  (*See, e.g.*, Ex. 14, 286:5-8; 310:4-9 (did not

10 consider information such as total number of customers or total sales data for Morning Star

11 bamboo in rendering expert opinion).

12      Aside from just pure numbers, Nelson and Hopps ignored differences in manufacturing of

13 types of bamboo in their selection and testing process.  The total population of Morning Star

14 bamboo includes products from seven different manufacturers, who produced various different

15 types of bamboo flooring.  (Crowe Decl. at ¶ 7, filed contemporaneously herewith.)  In contrast,

16 Nelson and Hopps ███████████████████████████████████████

17 ████████████████████████████████████████████

18 ██████████████████████████████████████████████████████████

19 (Ex. 14 at 4-5.)

20      While some non-statistically based sampling can be reliable for certain purposes, such as

21 random sampling designed to avoid subjective judgments and selection bias, Nelson and Hopps'

22 sampling methodology does not rise to this level.  Instead, Nelson and Hopps relied ██████

23 ██████ that are not representative of the larger population of flooring at issue to draw

24 conclusions about the rest.  (Ex. 15 at ¶¶ 19-21.) ██████████████████████████

25 ██████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ██████████████████████████████████████████████████████████

28 ██████████████████████████████████

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 (*Id.* at 17 (emphasis added).) ████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████ (Ex. 14 at 16:19.) ████████████████

7 ████████████████████████████████████████████████████

8 which is a non-random, non-representative sample that is chosen for reasons convenient to

9 personnel conducting the sampling and/or testing.  (Ex. 15 at ¶¶ 22-23.)

10          Where an expert's sample size is too small or too biased to generate reliable testing results,

11 the expert's conclusions are speculative and should be excluded under *Daubert.  See, e.g.*, *Hershey*

12 *Foods Corp. v. Waterman S.S Corp.*, No. 82 CIV. 0533 (DNE), 1994 WL 281929 (S.D.N.Y. June

13 22, 1994) *aff'd sub nom. Hershey Foods Corp. v. Waterman S.S. Corp.*, 43 F.3d 1458 (2d Cir.

14 1994) (expert did not apply proper sampling methods because expert took an inadequate sample

15 that would not be representative of the population of materials at issue); *Tyree v. Boston Sci.*

16 *Corp.*, 54 F. Supp. 3d 501 (S.D.W. Va. 2014), *as amended* (Oct. 29, 2014) (sample size was

17 insufficient to reveal reliable or statistically significant result).  Nelson and Hopps' samples are

18 both too small and biased, requiring any results or opinions generated from testing them to be

19 excluded.

20                    **ii.  Nelson and Hopps' testing methodology is fatally flawed.**

21          Nelson and Hopps' problems compound.  In addition to using improper sampling

22 methodologies, Nelson and Hopps tested the samples using a fatally flawed methodology.  As

23 described earlier, Nelson and Hopps' methodology did not follow existing scientific methods but

24 rather was self-designed. ████████████████████████████████

25 ████████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████████████



Nelson and Hopps' combined oven-dry/bucket tests suffer from at least four flaws in methodology.

*See Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472,

21

479 (1st Cir. 1997) (testing methodology flawed where no attempt was made to replicate conditions of injury-producing event).

**1. Nelson and Hopps' analysis of the complaint database is flawed because this data has a high known error rate, and they failed to compare their results to the total population sold, leaving it meaningless.**

In addition to using unreliable sampling and testing methodologies, Nelson and Hopps' analysis of the Lumber Liquidators' complaint database is flawed and cannot form the basis to draw any reliable conclusions regarding the overall defect rate of Morning Star bamboo products.



LUMBER LIQUIDATORS' NOTICE OF MOTION, MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES,
AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT - CASE NO. 3:14-CV-05373-TEH



**2. Nelson and Hopps' "company knowledge" opinion is speculative and not based in fact.**

Finally, it is entirely improper for Nelson and Hopps to review a handful of cherry-picked company documents and opine that Plaintiffs' alleged defects should have been "expected" and Lumber Liquidators was "aware of these defects." (SGH Report at 4-7, 46.) Nelson and Hopps reviewed an incredibly small number of documents in relation to the number of documents produced by Lumber Liquidators in this litigation. Even assuming they had the foundation to opine, in *In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d 164, 189 (S.D.N.Y. 2009), a defendant pharmaceutical company moved to strike plaintiffs' expert witness's testimony regarding the defendant company's "state of mind, knowledge or intent," arguing that there is "no scientific methodology or specialized knowledge that enables or qualifies a witness to determine the intent or knowledge of a pharmaceutical corporation." *Id.* The court agreed, noting the

expert's concession that her "expertise does not give her the ability to read minds," and that such "conjecture" "is not a proper subject for expert or even lay testimony." *Id.* at 192. So too should this Court find that Nelson and Hopps' opinions regarding Lumber Liquidators' knowledge are improper and inadmissible.

The problems with Nelson and Hopps' opinion are many: improper, unrepresentative, and biased sampling, unreliable test methodology that deviates from existing, generally accepted standards, and reliance upon a database with a high known error rate, to name a few. These opinions fail the gate-keeping test applied by this Court, cannot be used to make reliable conclusions about the general performance of Morning Star bamboo flooring, and are speculative and inadmissible under *Daubert.*

## CONCLUSION

For the foregoing reasons, Lumber Liquidators respectfully requests that the Court grant this Motion and exclude Plaintiffs' expert witnesses' opinions from any use in this case, including class certification.

Respectfully submitted,

MCGUIREWOODS LLP


By:    /s/ Bethany G. Lukitsch
       Bethany G. Lukitsch
       Attorney for Lumber Liquidators, Inc.