Jeffrey B. Cereghino, SBN 099480
jbc@rocklawcal.com
Michael F. Ram, SBN 104805
mram@rocklawcal.com
Matt Malone, SBN 221545
mjm@rocklawcal.com
RAM, OLSON, CEREGHINO
   & KOPCZYNSKI LLP
101 Montgomery Street, Suite 1800
San Francisco, California  94104
Telephone:  (415) 433-4949
Facsimile:  (415) 520-0308

Charles LaDuca
Brendan Thompson
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Ave., Suite 200
Washington, DC 20016
Telephone: (202)789-3960

*[Additional Counsel Listed on Signature Page]*

*Counsel for Plaintiffs and Proposed Class*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA GOLD, TAMMY EMERY, EDWIN MENDEZ, LAURA NORRIS, DONALD FURSMAN, and JOHN TRIANA, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>LUMBER LIQUIDATORS, INC., a Delaware corporation; and DOES1 through 200, inclusive,<br><br>                    Defendant. | Case No. 3:14-cv-05373-TEH<br><br><u>CLASS ACTION</u><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT LUMBER LIQUIDATORS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES**<br><br><u>REDACTED FILING</u><br><br>Date:        May 22, 2017<br>Time:        10:00 a.m.<br>Place:       Courtroom 2, 17th Floor<br>Judge:      Hon. Thelton E. Henderson<br><br>Complaint Filed:  December 8, 2014 |

1

## **TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ...................................................................................................... ii

3  I.      INTRODUCTION ......................................................................................................1

4  II.     ARGUMENT ............................................................................................................2

5          A.      Standard of Review ......................................................................................2

6          B.      Experts Peter Nelson and Emily Hopps of SGH Should Be Admitted ...................3

7          C.      Daniel Harrington's Testimony is Admissible .......................................................16

8          D.      Phil Waier's Testimony is Admissible. ..................................................................21

9  III.    CONCLUSION ........................................................................................................23

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1

**<u>TABLE OF AUTHORITIES</u>**

2

**Cases**

3

*Alaska Rent–A–Car, Inc. v. Avis Budget Group, Inc.,* 738 F.3d 960 (9th Cir. 2013) ......3, 5, 7

4

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014)........................7, 8, 11

5

*Comcast Corp v Behrend*, 133 S.Ct. 1426 (2013) .................................................................21

6

*Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993) ..................................................passim

7

*Den norske Bank AS v. First Nat'I. Bank,* 75 F. 3d 49 (1st Cir. 1996) ...................................3

8

*General Elec. Co. v. Joiner*, 522 U.S. 136 (2007) ................................................................12

9

*Ji v. Bose Corp.,* 538 F. Supp.2d 354 (D. Mass. 2008) ..........................................................3

10

*Kumho Tire Co v. Carmichael,*  526 U.S. 137 ( 1999)............................................................2

11

*McAdams v Monier* (Dist. Ct. 2015) WL 5968461 ..............................................................23

12

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005)..................................................................14

13

*Primiano v. Cook,*  598 F. 3d. 558 (9th Cir. 2010)....................................................2, 3, 7, 20

14

*Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807 (9th Cir.2014) ..............5

15

*See LG Elecs. U.S.A., Inc. v. Whirlpool Corp*., No. 08 C 242, 2010 WL 3397358 (N.D. Ill. Aug. 24, 2010)............................................................................................................................4

16
17

*Solar Sun Rings, Inc. v. Secard Pools*, 2016 WL 6138294 (C.D. Cal. Jan. 20, 2016)...........14

*United States v. Sandoval-Mendoza*, 472 F. 3d 645 (9th Cir. 2006).......................................2

18
19

*US v. Sleigh*, 2015 WL 3866270 (N.D. Cal. June 22, 2015)..............................................5, 14

**Rules**

20

Fed. R. Evid. 702 ..................................................................................................................2

21
22
23
24
25
26
27
28

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1     **I.     INTRODUCTION**

2          Plaintiffs respectfully request that the Court deny the Lumber Liquidators Inc. ("Lumber"

3     or "Defendant") motion to exclude Plaintiffs' expert witnesses, Emily Hopps, Peter Nelson,

4     Daniel Harrington and Phillip Waier and any related deposition testimony.

5          Engineers Peter Nelson and Emily Hopps of Simpson, Gumpertz, & Heger (SGH) opine

6     that Morning Star strand bamboo made at different plants and sold since 2008 is (1) defective

7     (will excessively shrink and expand) when subjected to reasonable ranges of relative humidity

8     causing the locking mechanisms of Morning Star to become loose or break, (2) unable to last 30-

9     years as represented, and (3) sold with inadequate installation instructions.

10         Defendant does not attempt to refute the damaging conclusions of SGH's Report, which

11     ██████████████████████████████████████████████, nor does it attempt

12     to question the qualifications of the experts conducting the study.  Defendant instead argues the

13     sample size was inadequate, the testing methodology improper, and the consumer complaint data

14     base analysis incorrect.  Lumber never provides any evidence as to what sample size would be

15     adequate and never tells the Court that is uses a similar, if not smaller, sample size when

16     evaluating Morning Star.   Tellingly, Defendant's experts performed no testing of their own.

17     SGH's testing methodology is consistent with approved standards and conduct by very

18     experienced experts.  Again, Defendant's own testing methodologies used for its product are not

19     remotely as thorough as Plaintiffs employed.  If there is a dispute concerning who is correct

20     about the details of the testing methodologies, the forum for resolution is trial—not expert

21     exclusion.  Also, Lumber's criticism of its own data base performed by SGH is an issue best left

22     to trial resolution.  Reasonable experts can differ.  Determining which is "correct" is an issue for

23     the finder of fact.

24         Plaintiffs' expert Daniel Harrington offers the simple and singular opinion that in

25     virtually every case, Morning Star flooring will need to all be removed, not just one board.

26     Defendant, ignoring Mr. Harrington's years of experience in evaluating bamboo flooring claims,

27     argues that he must inspect a bamboo floor to be an expert, not just teach bamboo flooring

28     inspection classes to inspectors who seek certification, or be the source they turn to for complex

bamboo flooring inspection and performance issues.

Phillip Waier, of R.S. Means, provides a damage calculation model similar to those he has proffered at trial in other building product class action cases. The formula is not terribly complex.  There are only a few moving parts.  The old floor comes out, the new floor gets installed.  The damage model has essentially three variables.  The cost of removing the floor, the cost of the new floor product, and the labor cost for doing both.  That's it. The cost of removing flooring is known, and it makes virtually no difference whether it is bamboo or hardwood.  R.S. Means collects data nationally and can apply that data regionally also.  The cost of new floor is also readily obtainable.  As easily as Lumber's customers calculate the cost of flooring by internet research on flooring websites.  And labor costs are for installing a wood or bamboo floor are nationally and regionally collected by R.S. Means.  That is their unique expertise.  They do not define the repair, only the cost of performing it.

Each of the experts opinions are based upon methodologies and experience that more than meet the standard for reliable opinion testimony under Fed. R. Evid. 702, and *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993).  The criticisms offered by Lumber go to the weight of the evidence, not its admissibility. Nothing precludes Lumber or its experts from challenging Plaintiffs expert evidence at summary judgment or trial. Lumber's motion should be denied.

## II.     ARGUMENT

### A.     Standard of Review

The trial court has wide discretion to act as a gatekeeper for the admissibility of expert testimony. *Kumho Tire Co v. Carmichael*,  526 U.S. 137, 151-52 (1999). A party may introduce expert testimony if the expert is properly qualified, the testimony is based upon sufficient facts or data, the testimony is the product of reliable principals and methods, and the witness has applied the principles and methods reliably to the facts of the case.  *See Primiano v. Cook,*  598 F. 3d. 558, 564 (9th Cir. 2010) (citing Fed. R. Evid. 702) Expert opinions are relevant if the knowledge underlying them has a " valid connection to the pertinent inquiry." *United States v. Sandoval-Mendoza*, 472 F. 3d 645, 654 (9th Cir. 2006) ( internal quotation marks and alteration omitted).  Opinions based upon customs, practices, or experience are relevant if expert witnesses

describe their relevant background and explain how that background informed their opinions. *See, e.g. Den norske Bank AS v. First Nat'l. Bank,* 75 F. 3d 49, 57-58 (1st Cir. 1996) (permitting a banking executive who had worked in banking for forty years to testify about the industry custom to allow minority-participant vetoes); *Ji v. Bose Corp.,* 538 F. Supp.2d 354 (D. Mass. 2008)  (allowing a casting director for photo shoots to testify about custom and practices in the modeling industry relative to photographer rights)

The trial court's task is not to "decid[e] whether the expert is right or wrong, just whether his testimony has substance that would be helpful to a jury." *Alaska Rent–A–Car, Inc. v. Avis Budget Group, Inc.,* 738 F.3d 960-70  (9th Cir. 2013).  Courts may not exclude testimony simply because it is impeachable. *Id.* at 969. *"*Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d. at 564 (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 596 (1993).

### B.    Experts Peter Nelson and Emily Hopps of SGH Should Be Admitted

Lumber's contention that experts Peter Nelson and Emily Hopps' ("SGH") report is unreliable is infirm and factually baseless.  Lumber only challenges SGH's sample lot selection and applied methodology.  It makes no effort whatsoever to refute SGH's main findings that



[2] All Exhibits are attached to the accompanying declaration of Jeffrey Cereghino.

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1 ████████████████████████████████████████████████████

2 ████████████████████████  ████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████

**1.   SGH is Qualified and Has Specialized Expertise**

Lumber has not directly challenged SGH's qualifications to serve as experts in this litigation, and those qualifications are amply demonstrated by the record.  In addition to being an engineer licensed in thirty-six states, Mr. Nelson has nearly 40 years of experience in building-envelope systems, including over a dozen floor investigations, presentations and publications. Ms. Hopps, who is an engineer in six states, has been with SGH for 13 years and leads its flooring practice (which includes design, failure investigation and repair).  SGH's knowledge, experience, qualifications, and skill are unquestioned.  *See LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358, at *2 (N.D. Ill. Aug. 24, 2010) (citing Advisory Committee Notes to Rule 702) ("In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony.").

**2.   SGH's Analysis of the Samples Is Reliable.**

SGH's Samples were sufficient, are what Lumber called for, and were representative.

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████

In assessing admissibility of expert opinions, it is important to note that the role of the trial court is to eliminate "unreliable nonsense opinions, but not exclude opinions merely

―――――――――――――――――――

3 ████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████

████████████████████████████████████

1   because they are impeachable." *Alaska Rent–A–Car,* 738 F.3d at 969.  The Ninth Circuit has

2   described the appropriate inquiry as follows: "The district court is not tasked with deciding

3   whether the expert is right or wrong, just whether his testimony has substance such that it would

4   be helpful [.]" *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.,* 752 F.3d 807, 813 (9th

5   Cir.2014) (citing *Alaska Rent–A–Car,* 738 F.3d at 969).   Thus, "the critical inquiry remains

6   whether there is evidence of unreliability… in a particular case; there is no per se rule regarding

7   sample size…"  *US v. Sleigh,* 2015 WL 3866270 at *2 (N.D. Cal. June 22, 2015).

8        Lumber's suggestion that the 177 samples selected by SGH were improper is misguided.

9   *See* Brief at pp. 18-20. ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████████████████

11  ████████████████████████  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████████████

14  ███████████████████████████████████████████████        Concerning the Plaintiffs'

15  samples, they were installed in homes located across the country (CA, PA, IL, MN, FL and WV)

16  and ranged in dates of production (2013 to 2014) and manufacturing plants.  SGH conducted

17  visual examinations of each of the Named Plaintiffs' floors.  (Exh. 1, SGH Report at pp. 12-17.)

18  The new store samples that were purchased from stores in MA, IL, CA, NY and the District of

19  Columbia and range in dates of production (2014 and 2015) and manufacturing plants were

20  never adhered to a floor or in-service at any time.  SGH's sample size was adequate and

21  representative.   "Our testing included a large enough overall sample size to demonstrate a

22  consistent trend in expansion and contraction.  (Exh. 11, Nelson Declaration a p. 2█████████

23  ████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████

25  ████████████        Also the lot size SGH studied comports with the industry's trade publications.  (*See,*

26  *e.g.,* Arens and Baughman, Indoor Humidity and Human Health-Part 1: ASHRAE,[4] at p. 196

27

28  ─────────────────────

    [4] http://www.cbe.berkeley.edu/research/pdf_files/ArensBaughman1996_Pt2.pdf

1   (citing Smith, et al. (1985) showing that different relativity humidity range testing, related to

2   mite allergens, only required a sample set of 20 homes; citing Hart and Whitehead (1990),

3   showing that similar testing only required a sample set of 30 homes; citing Korsgaard (1983a,

4   1983b), showing that similar testing only required a sample set of 50 Danish apartments).

5          Lumber claims that the new samples were tested by SGH after being preserved in SGH's

6   storage warehouse for several months and that "perhaps" damage to their "original composition"

7   took place.  (*See* Brief at p. 22.)  The only reasonable takeaway from this argument is that

8   Lumber appears to be making the stunning admission that *every* Morning Star board it made in

9   China, shipped across the ocean in shipping containers, transported by trucks to its various stores

10  across the country, and placed on shelves for sale since at least 2008, will have issues with its

11  "original composition."[5]  Lumber's other claim that the newly bought samples were not tested at

12  the same time along with the other samples is also frivolous.  SGH was clear during its

13  deposition that ███████████████████████████████████████████████

14  ██████████████████████████  The various samples SGH observed and

15  forensically tested were representative and allow for inferences to be made.

16         SGH's sample selection process is entirely consistent with that which Lumber itself

17  employs as representative and adequate samples:



26  _____

27         [5] Plaintiffs invite Lumber to further explain what issues Morning Star's "original
    composition" will suffer when it is subjected to the path-to-sale sequencing described here.

28         [6] *See* http://www.lumberliquidators.com/ll/c/Golden-Zebra-Strand-Bamboo-Morning-
    Star-PRBAMSTZ/10015285 (last visited Apr. 19, 2017) (showing Article # 10015285 to be

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1
2
3
4
5
6
7
8



9
10   As illustrated, SGH followed a similar sampling process and practices that Lumber does.

11   Thus, Lumber's attempt to claim the sampling process was unrepresentative should be rejected.

12   ### 3.   SGH's Methodology is Accepted and Reliable.

13   Unable to refute SGH's damaging testing results, Lumber devotes its attention to

14   challenging SGH methodology.

15   In the Ninth Circuit... expert evidence is inadmissible where the analysis is the result of
16   a faulty methodology or theory as opposed to imperfect execution of laboratory
      techniques whose theoretical foundation is sufficiently accepted in the scientific
17   community to pass muster under *Daubert*.  The rationale of this approach is that [a]
      minor flaw in an expert's reasoning or a slight modification of an otherwise reliable
18   method does not render expert testimony inadmissible.

19   *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047–48 (9th Cir. 2014) (internal

20   quotation marks and citations omitted).

21   Again, the purpose of the district court's inquiry is "to screen the jury from unreliable

22   nonsense opinions" and not to "exclude opinions merely because they are impeachable." *Alaska

23   Rent–A–Car,* 738 F.3d at 969.  In so doing, the district court functions as a "gatekeeper, not a

24   fact finder." *Primiano,* 598 F.3d at 565 (internal quotations omitted).  "Shaky but admissible

25   evidence is to be attacked by cross examination, contrary evidence, and attention to the burden

26   of proof, not exclusion." *Id.* at 564 (citation omitted).

27
28   _____

Morning Star 5/8" x 3-3/4" Golden Zebra Strand Bamboo).

1

2
3
4
5
6
7
8

> The test of reliability is flexible… The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance... But these factors are meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case.  The test is not the correctness of the expert's conclusions but the soundness of his methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony… Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

9

10

11

*City of Pomona*, 750 F.3d at 1044 (internal citations and quotation marks omitted); Here, Lumber's entire argument is simply a rebuttal of SGH's conclusions, asking the Court to step into the fact-finder role. The Court must decline to do so.

12

13

**4. SGH Conditioned Morning Star Using Relative Humidity Ranges Commonly Cited in Studies and as Recommended by Lumber.**

14

15

16

17

When engineers conduct investigations, they investigate and test until they reach an ultimate conclusion.  Once the engineer is satisfied that he or she has reached the appropriate conclusion, the investigation is over.  (*See generally*, Billy Vaughn Koen, Definition of the Engineering Method (Amer. Soc. Of Eng. Edu. 1985).)  Following this principle, ████

18

19

20

21

22

23

24

25

26

████████████████████████████████████████████

27

████████████    ████████████          The ranges tested by SGH are common.  For

28

instance, the 2017 American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE") Handbooks set standards of: (1) museums, libraries and archives at a relative

humidity ("RH")% of 40-60%; (2) natatorium (recreational) at a RH % of 50-60; and (3) health care facilities at a RH % of 20-60%.  (Exh. 1, SGH Report at pp. 10-11.)  "The range of 25 percent to 60 percent is typically defined as the comfort range."  (Building Science Corp., *Relative Humidity*, J. Lstiburek, Apr. 23, 2002.)  According to a 2010 study by the U.S. Department of Housing and Urban Development (HUD) that monitored relative humidity rates using a sample of sixty homes, the range was as follows for three distinct regions observed: the Southwest ranged between 47 to 56%; the wet Northwest region ranged between 36 to 57%; and the cold Northeast ranged between 48 to 60%. (https://www.huduser.gov/Publications/pdf/InternalMoistureLoad.pdf, at pp. 12-13 (last accessed Apr. 21, 2017[7]).  A table in the HUD Report, p. 19 (Fig. 5), charting the RH in the Southwest during 2008 to 2009, shows the RH was over 90% and under 30% habitually:



*See also* Arens and Baughman, Indoor Humidity and Human Health-Part 1: ASHRAE, at p. 193 (commenting that values set for the upper limits have typically ranged from 60% to 80%)[8]; Energy Center of Wisconsin, Field Study of Ventilation in New Wisconsin Homes, Jan. 2003, p. 26 ("we consider 30 to 40 percent relative humidity to be the appropriate target zone for Wisconsin")[9]; PATH, Building Moisture and Durability, HUD, Oct. 2004, at p. 11 (commenting that "[r]ecently recommendations have been published calling for RH as low as 15% in very

---

[7] *See* Exh. 21.

[8] http://www.cbe.berkeley.edu/research/pdf_files/ArensBaughman1996_Pt2.pdf (last visited Apr. 24, 2017).

[9] https://seventhwave.org/sites/default/files/216-1.pdf (last visited Apr. 24, 2017).

cold climates").[10])

Pointedly, Lumber never tested Morning Star's humidity stability even though it knew that ███████████████████████████████████████████████████████



**5. SGH Testing the Samples Using Accepted Lab Test Methods.**

On a weekly basis, SGH ██████████████████████████████████████████████

Lumber's claims that SGH misapplied ASTM by ████████████████████████████████

[10] https://www.huduser.gov/Publications/pdf/BuildingMoistureandDurability.pdf (last visited Apr. 24, 2017).

- 10 -                                    Case No. 3:14-cv-05373-TEH

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

According the Ninth Circuit:

"[E]xpert evidence is inadmissible where the analysis 'is the result of a faulty methodology or theory as opposed to imperfect execution of laboratory techniques whose theoretical foundation is sufficiently accepted in the *1048 scientific community to pass muster under *Daubert*'…The rationale of this approach is that '[a] minor flaw in an expert's reasoning or **a slight modification of an otherwise reliable method' does not render expert testimony inadmissible**. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002). A more measured approach to an expert's adherence to methodological protocol is consistent with the spirit of *Daubert* and the Federal Rules of Evidence: there is a strong emphasis on the role of the fact finder in assessing and weighing the evidence. *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786."

*City of Pomona* 750 F.3d at 1047–48 (citations omitted) (emphasis added).

**6. SGH's Test Methods Replicate Common Environments.**

Lumber contends that SGH's evaluation of Morning Star subjected

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1 ████████████████████████████████████████████████████████

2 █████████████ █████████████████████████████ ██████████████

3 ████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ██████████████████████████████████ ███████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████ █████████████████████████

9 ████████████████████████████████  SGH's familiarity with properties and dimensions of

10 installed and non-installed Morning Star is vast, as it visually inspected dozens of the boards at

11 the Warehouse in Toana, Virginia and the Named Plaintiffs' flooring.

12   **4.   SGH's Analysis Allowed for Inference and Extrapolation.**

13     SGH was able to make inferences and extrapolate from its results to the population and it

14 is true that "[t]rained experts commonly extrapolate from existing data" where, like here, there is

15 no "too great an analytical gap between the date and the opinion." *General Elec. Co. v. Joiner*,

16 522 U.S. 136, 146 (2007).[11] ██████████████████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████████  (Plaintiffs' Class Cert.

19 Brief, p. 3.)

20     *Second*, its lab's sampling and methods were reliable and valid. ███████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ███████████ ████████████████████████ ███████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ███████████████████████ ██████████████████████████████████

27 ───────────────────────

28   [11] Tellingly, none of Lumber's three experts conducted any forensic testing of  Morning
Star for the purposes of their reports.

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1

2 "In

3 science, 'reliability' refers to reproducibility of results."  (David H. Kaye & David Freeman,

4 Reference Guide on Statistics in Reference Manual on Scientific Evidence at p. 102 (Fed.

5 Judicial Ctr. 2d ed. 2000).)

6

7

8 "A valid

9 measuring instrument measures what it is supposed to."  David H. Kaye & David Freeman,

10 Reference Guide on Statistics in Reference Manual on Scientific Evidence at p. 103 (Fed.

11 Judicial Ctr. 2d ed. 2000).)

12

13

14

15

16 In an effort

17 to minimize the Database's utility, Lumber contends, that its Database is not "actual evidence"

18 and merely generic in nature.  (*See* Brief at pp. 22-24.) Lumber's argument rests on a profound

19 misunderstanding of its own Database.

20

21

22

23

24

25

26

27

28

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████  ████████████████████

3 ██████████████████████████████████████████████████████████

4 ████████████████████

5      Instead of acknowledging that it utilizes the Database to organize the thousands of

6 Morning Star complaints it receives ████████████████████████, Lumber

7 refers to the information, as "garbage." (*See* Brief at p. 24.)  Referring to the contents of its

8 Customer Complaint Database as "garbage" is curious.  Further, Lumber's attacks that SGH

9 double counted entries contained in the Database were concretely refuted by Ms. Hopps, who

10 testified that ████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████████

18 ████████████████████████

19      As illustrated here, the evidence and testing results contained in SGH's Report allow for

20 reasonable inferences to be made that may be extrapolated to the entire population of Morning

21 Star. *See e.g. Obrey v. Johnson*, 400 F.3d 691, 697 (9th Cir. 2005) (because challenges to

22 statistical study "went to weight and sufficiency rather than admissibility" of evidence, "the

23 district court abused its discretion when it excluded this evidence"); *US v. Sleugh*, 2015 WL

24 3866270, at *2-3 (N.D. Cal. June 22, 2015) (where defendant failed to provide authority that a

25 small sample size is inherently unreliable the court found no need to even hold a *Daubert*

26 hearing on the proposed experts' qualifications); *Solar Sun Rings, Inc. v. Secard Pools*, 2016

27 WL 6138294, *4 (C.D. Cal. Jan. 20, 2016) ("Downey's survey may indeed be technically

28 lacking.  For example, his sample size is limited and it is not entirely clear how he derives his

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

estimates from the data he provides.  At this stage, however, those technical deficiencies do not support excluding his testimony altogether…   Moreover, the Court is unpersuaded that Downey's opinion must be excluded because he drew his conclusions from a relatively small sample size.").

### 5.  SGH is Qualified to Testify About Litigation Materials it Reviewed.

Lumber' final salvo is to seek exclusion of SGH from offering any opinions about the damaging Lumber internal documents and other litigation materials it observed.  Contrary to Lumber' claim, Brief at pp. 24-25, ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████  SGH's findings will be helpful to the trier of fact.  SGH's opinion is both reliable and relevant to the issues here since it relied on extensive experience and Lumber' own documents in offering its opinion (that Morning Star will not last 30-years as represented, that the installation instructions are inadequate, and that the company was aware of the defects).  Moreover, *Daubert* concerns the admissibility of an expert's testimony rather than the weight that testimony should carry with the trier of fact.

### 6.  Lumber's "Low Claims Rate" Argument Is a Mirage.

Lumber' contention that the number of Morning Star customers' complaints are less than its sales, which attempts to imply that Plaintiffs' defect claims are insignificant, is not supported by the record and is contrary to its admissions. ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ ██████████████████████████████████

███████████████████████████████████████████████████████

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████ Further, a large

3 segment of customers simply do not make claims – which alters the claims rate Lumber seeks to

4 portray here.  For instance, customers will not make claims who: do not think it is worth the

5 effort; are not aware of the warranty; have forgotten that they may make a claim; or believe that

6 failures should be remedied by a third-party.

7      **C.**    **Daniel Harrington's Testimony is Admissible**

8      Throughout its argument to exclude Mr. Harrington, Lumber refers to "standards" and

9 "methodologies" and "peer review, all language drawn from *Daubert* and its progeny. But

10 before any determination of whether Mr. Harrington's opinion should be excluded based on

11 some alleged failure, first the moving party has to provide evidence as to the "standards," or

12 "methodology" or "peer review."   Defendant's brief lacks any reference to what standards exist,

13 or what are accepted methodologies, or even if any peer review process exists.  In short, Lumber

14 fails to provide this Court with any metric to measure if Mr. Harrington opinion is "junk

15 science" or not.   Defendant's motion should be denied without any further analysis because of

16 the complete lack of any evidence reflecting bamboo flooring inspection standards, or

17 methodologies, or whether any peer review exists in the bamboo industry.  Defendant expects

18 the Court to *assume* such standards exist, and then apply the assumed standards to Mr.

19 Harrington. On this shaky basis alone, Defendant's motion to exclude Mr. Harrington should be

20 denied.

21      However Plaintiffs need not rely upon Defendant's failures to overcome this motion,

22 because Mr. Harrington is more than qualified to opine on the consequences of flooring failure.

23      Defendant begins its attack on Mr. Harrington by criticizing that he "has not inspected a

24 single plank of Plaintiff's flooring and has never inspected or installed any floor for

25 compensation throughout his entire career" (*See* Brief at p.6.)   Without offering a shred of

26 supporting evidence, Defendant wants the Court to assume that *one must have inspected a floor*

27 *or installed a floor to qualify as an expert.*   Nowhere does Defendant provide the Court with

28 any guidelines for what qualifies one person or another to be considered an expert in bamboo

1   flooring.  But what is known is that in order to become a certified bamboo flooring inspector,

2   you have to take Mr. Harrington's course on bamboo.



13        Given that the National Wood Flooring Institute (NWFA) selected Mr. Harrington to

14   teach individuals how to inspect bamboo floors, it seems unlikely that this organization would

15   select someone who did not have the expertise to teach inspectors.

16        But we do not need to rely upon the common sense supposition that the primary national

17   organization issuing inspector certificates would select the most qualified person to teach, we

18   have Defendant's attestation to Mr. Harrington's knowledge and expertise.

19        In July 2014, "Phillip" from Lumber Liquidators technical department corresponded with

20   Mr. Harrington.  He asked the following question:

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1 ████████████████████████████████████████████████

2 ████████████████████████████

3 ███████████████████████████████████████████████

4 ████████████

5 █████████████ ██████████████████████

6 ██████████████████████████████████

7     The forgoing exchange illustrates one dispositive fact: ████████████████

8 ████████████████████████████████████. As

9 Phillip said, ██████████████████████████████

10 ████████

11     Defendant's technical personnel are not alone in recognizing Mr. Harrington's

12 qualifications, many others in the bamboo flooring universe do also.

13 ████████████████████████████████████

14 █████████████████████████████

15 ███ ████████████████████████

16 ████████████████████████████████

17 ████████████████████████████████████████

18 ██████████████████████████████████████

19 ███████████████████████████████████████

20 ███████████████████████████████████

21 ████████████████████

22     Defendant is critical of Mr. Harrington's "methodology", in rendering his opinion that in

23 "virtually all cases" a defective bamboo floor needs to be replaced in its entirety.  Defendant

24 argues that Mr. Harrington has "no personal experience installing, inspecting and replacing

25 bamboo floors", however that is not relevant to his opinion.  His opinion is about the *failure* of

26 bamboo floors and the remedy for it.

27     Defendant's characterization of Mr. Harrington experience in observing flooring is

28 misleading.  He testified as follows:

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES



Again, Lumber offers no evidence as to what the "methodology" might be with regard to remediating failed bamboo floors----or even whether any exists.  Mr. Harrington's experience more than qualifies him to opine on how to remediate failed bamboo flooring.

Defendant attacks Mr. Harrington's experience in reviewing bamboo flooring claims, without offering any metric to gauge his experience.  He testified he had "

At the core of Defendant's motion is the unsupported assumption that the bamboo flooring industry is deeply rooted in some level of scientific framework.  That assumption is simply not true. As Mr. Harrington testified:

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

Defendant offers no contrary evidence.

Defendant's attempts to diminish Mr. Harrington's published articles on bamboo flooring---the same one their own employee found very informative -- by suggesting the articles were not subject to peer review.  Of course, that only matters if there are actual peers to review them, and a process for that review.  Defendant elected to offer no insights into those dispositive questions, instead rely upon inference and assumption.  Neither should be the foundation for exclusion.

Defendant's final attack on Mr. Harrington attempts to elevate a vaguely presumed bias into a *Daubert*-level reliability analysis.  Bias arguments go to the weight of the testimony, not its admissibility. And Defendant offers no authority to support excluding a witness because of bias, real or false.   Furthermore, the merits of Defendant's bias argument are severely undercut by Mr. Harrington's testimony.

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES

1    ███████████████████████████████████████

2    The "test of reliability is flexible and Daubert's list of specific factors neither necessarily

3    nor exclusively applies to all experts or in every case". *Primiano* 598 F.3d. at 564.   Mr.

4    Harrington is very qualified to render opinions and inform the trier of fact.   The irony of

5    Defendant's flimsy attempt to exclude Mr. Harrington, is that the expert Defendant utilizes in

6    this motion, Mr. Kass, is very likely Mr. Harrington's pupil.

7    Defendant's request to exclude Mr. Harrington's evidence should be denied.

8    **D.      Phil Waier's Testimony is Admissible.**

9    Defendant completely misconstrues the thrust of Mr. Waier's declaration, and the case

10   law regarding damage calculations.   In *Comcast Corp v Behrend*, 133 S.Ct. 1426, 1433 (2013)

11   the Supreme Court held that damages must be "capable of measurement on a classwide basis"

12   Defendant primary contention for exclusion of Mr. Waier is that he has not calculated classwide

13   damages.   That is not the requirement.   Mr. Waier has demonstrated, using the identical damage

14   calculation methodology accepted in numerous class cases,  how the damages can be measured.

15   The damages calculation here is as simple as the product at issue.   This is not a complex

16   anti-trust case, nor even a moderately complicated wage and hour case.   This case is about

17   flooring.   Only three elements—the material, the labor cost to remove, and the labor cost to

18   replace, make up potential damages relating to the cost of replacement

19   Mr. Waier testified as follows when asked about his methodology:



OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES



1

2      In the forgoing exchange, repeated multiple times in Mr. Waier deposition, he provides

3 the mechanism for damage calculation.  It is simple.

4

5      He further explains:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      Mr Waier provides in his declaration, and supported by his testimony a clear roadmap to

24 how a classwide damage methodology would be employed.

25

26                               It is a simple calculation that results in a per square foot or per board

27 damages for every class member.

28      Mr. Waier has qualified to testify before numerous courts using the precise damage

1    methodologies set forth in his declaration and testimony.   In a unpublished opinion, the Third

2    District Court of Appeal for California accepted without question Mr. Waier's classwide damage

3    model, and his trial testimony articulating the classwide damages for a roofing class action.

4    (Exh. 36, *McAdams v Monier* (Dist. Ct. 2015) WL 5968461). Defendant's motion to exclude

5    should be denied.

6    **III.     CONCLUSION**

7            Based on the foregoing, Defendants' Motion to Strike Testimony of Plaintiffs' Expert

8    Witnesses should be denied.

9

10   Dated:  April 28, 2017          By:     s/S. Clinton Woods
                                             Michael McShane
11                                           S. Clinton Woods
                                             Email:  cwoods@audetlaw.com
12                                           AUDET & PARTNERS, LLP
                                             711 Van Ness Ave, Suite 500
13                                           San Francisco, CA  94105
                                             Telephone:  (415) 568-2555
14
                                             Jeffrey B. Cereghino, SBN 099480
15                                           Email: jbc@rocklawcal.com
                                             RAM, OLSON, CEREGHINO
16                                             & KOPCZYNSKI LLP
                                             101 Montgomery Street, Suite 1800
17                                           San Francisco, California  94104
                                             Telephone:  (415) 433-4949
18                                           Facsimile:  (415) 520-0308

19                                           Charles LaDuca
                                             Brendan Thompson
20                                           Cuneo Gilbert & LaDuca, LLP
                                             4725 Wisconsin Ave., Suite 200
21                                           Washington, DC 20016
                                             Telephone: (202)789-3960
22
                                             Beth E. Terrell, CSB #178181
23                                           Email: bterrell@tmdwlaw.com
                                             Mary B. Reiten, CSB #203142
24                                           Email:  mreiten@tmdwlaw.com
                                             TERRELL MARSHALL DAUDT
25                                             & WILLIE PLLC
                                             936 North 34th Street, Suite 300
26                                           Seattle, Washington  98103-8869
                                             Telephone:  (206) 816-6603
27                                           Facsimile:  (206) 350-3528

28
                                             Robert Shelquist
                                             Lockridge Grindal & Nauen

1

100 Washington Avenue South
Suite 2200

2

Minneapolis, MN 55401
Telephone:  (612) 339-6900

3

Email: rkshelquist@locklaw.com

4

*Attorneys for Plaintiffs and Proposed Class*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES