1  Michael F. Ram, SBN 104805
   Email: mram@robinskaplan.com
2  ROBINS KAPLAN LLP
   2440 West El Camino Real, Suite 100
3  Mountain View, CA 94040
   Telephone: (650) 784-4040
4  Facsimile: (650) 784-4041

5
   Jeffrey B. Cereghino, SBN 099480
6  Email: jbc@cereghinolaw.com
   CEREGHINO LAW GROUP
7  101 Montgomery Street, Suite 1800
   San Francisco, California  94104
8  Telephone: (415) 433-4949
   Facsimile: (415) 433-7311
9

10 Charles J. LaDuca, *Admitted Pro Hac Vice*
   Email:  charles@cuneolaw.com
11 Brendan Thompson, *Admitted Pro Hac Vice*
   Email:  brendant@cuneolaw.com
12 CUNEO GILBERT & LaDUCA, LLP
   4725 Wisconsin Avenue, NW, Suite 200
13 Washington, DC 20016
   Telephone:  (202) 789-3960
14

15 *Class Counsel*

16 *[Additional Counsel Appear on Signature Page]*

17
                UNITED STATES DISTRICT COURT
18           FOR THE NORTHERN DISTRICT OF CALIFORNIA

19 DANA GOLD, TAMMY EMERY, MARY
   LOUISE FERENCE, LAURA NORRIS,          No. 3:14-cv-05373-RS
20 DONALD FURSMAN, and JOHN TRIANA,
   on behalf of themselves and all others  **SIXTH AMENDED CLASS
21 similarly situated,                     ACTION COMPLAINT**

22                                         <u>CLASS ACTION</u>
                       Plaintiffs,
23                                         JURY TRIAL DEMAND
            v.
24                                         The Honorable Richard Seeborg
25 LUMBER LIQUIDATORS, INC., a Delaware
   corporation; and DOES 1 through 200, inclusive,  Complaint Filed:  December 8, 2014
26
                       Defendants.
27

---

NO. 3:14-CV-05373-RS–SIXTH AMENDED CLASS ACTION COMPLAINT                    1

Through the undersigned counsel and pursuant to ECF No. 215 (Order Granting Motion for Class Certification), Plaintiffs DANA GOLD, TAMMY EMERY, MARY LOUISE FERENCE, LAURA NORRIS, DONALD FURSMAN, and JOHN TRIANA on behalf of themselves and all others similarly situated ("Plaintiffs"), file this sixth amended class action complaint against Defendant Lumber Liquidators, Inc. ("Defendant" or "Lumber Liquidators"). On personal knowledge of their own circumstances and upon investigation and information and belief of their counsel, Plaintiffs aver the following:

**INTRODUCTION**

1.      Defendant develops, manufactures, advertises, sells, and distributes bamboo flooring under the brand name Morning Star Strand Bamboo Flooring (the "Product") throughout the United States for installation in homes and other structures.

2.      Defendant markets that the Product is durable and meets industry standards, and markets and warrants that the Product has a thirty (30) year warranty,  a warranty that when ultimately provided well after purchase to the buyer does not in actuality cover the types of damages alleged herein.   Defendant provided a reasonable expectation to consumers and the industry that the Product would have a usable lifetime of at least thirty (30) years.

3.      Contrary to Defendant's advertising and representations, the Product is subject to premature cracking, splitting, warping, and shrinking, all well before the misleading warranted useful life.

4.      The Product's various modes of failure potentially cause damage to other building components and render the Product susceptible to premature failure.

5.      Plaintiffs bring this action to seek redress for damages caused by Defendant's wrongful conduct.

**JURISDICTION**

6.      This Court has jurisdiction over this case under 28 U.S.C. 1332(d)(2) in that: (1) this action is a class action with more than one hundred (100) Class Members; (2) Defendant Lumber Liquidators, Inc. is a Delaware corporation, based in the state of Virginia, and is thus a

citizen of the state of Delaware; (3) Plaintiffs and all Class Members are United States citizens; and (4) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

## VENUE

7.      Venue in this Court is proper: (1) pursuant to 28 U.S.C. 1391(a)(1) in that Defendant does sufficient business in this District to subject it to personal jurisdiction herein; and (2) pursuant to 28 U.S.C. 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## INTRADISTRICT VENUE

8.      Venue in this Division of the Northern District is proper because a substantial part of the events or omissions which give rise to the claim occurred in Contra Costa County.

## PARTIES

9.      Plaintiff Dana Gold ("Plaintiff Gold") is a California resident and owns a home located at 1192 Bacon Way in Lafayette, California.

10.      Plaintiff Tammy Emery ("Plaintiff Emery") is a West Virginia resident and owns a home located at 219 Picket Avenue in Inwood, West Virginia.

11.      Plaintiff Mary Louise Ference ("Plaintiff Ference") is an Illinois resident and owns a home located at 1301 South Douglas Street in Springfield, Illinois.

12.      Plaintiff Laura Norris ("Plaintiff Norris") is a Minnesota resident and owns a home located at 7327 West 110th Street in Bloomington, Minnesota.

13.      Plaintiff Donald Fursman ("Plaintiff Fursman") is a Pennsylvania resident and owes a home located at 626 Trimble Boulevard in Brookhaven, Pennsylvania.

14.      Plaintiff John Triana ("Plaintiff Triana") is a Florida resident and owns a home located at 24 Captiva Drive in Ponte Verde Beach, Florida.

15.      Defendant Lumber Liquidators, Inc. is a Delaware corporation with its principal place of business in Toano, Virginia.  Plaintiffs are informed and believe that Defendant

1    conducts business within the United States, and more specifically within the state of California.

2    Also on information and belief, Plaintiffs allege that Defendant was responsible for, or

3    otherwise involved in, the development, manufacture, marketing, sales, warranting and

4    distribution of the Product.

5         16.    Plaintiffs are ignorant of the true names and capacities of Defendants sued

6    herein as Does 1 through 100, inclusive, ("Doe Defendants") and therefore sues these Doe

7    Defendants by fictitious names.  Plaintiffs will amend this Complaint to allege the true names

8    and capacities of these fictitiously-named Doe Defendants when they are ascertained.  Each of

9    the fictitiously-named Doe Defendants is responsible for the conduct alleged in this Complaint

10   and Plaintiffs' damages were actually and proximately caused by the conduct of the fictitiously

11   named Doe Defendants.

12        17.    Plaintiffs are informed and believe, and on that basis allege, that each of these

13   Doe Defendants was the agent, joint venture, and/or employee of Defendant and/or the Doe

14   Defendants, and in doing the things hereinafter alleged, were acting within the course and

15   scope of the agency, joint venture, and employment with the advance knowledge, acquiescence,

16   or subsequent ratification of Defendant and each and every other Doe Defendant.

17                          **FACTUAL ALLEGATIONS**

18   **B.    Plaintiff Gold's Factual Allegations**

19        18.    Plaintiff Gold is a California resident and owns a home located at 1192 Bacon

20   Way in Lafayette, California.

21        19.    Before purchasing the Product, Plaintiff Gold visited her local Lumber

22   Liquidators store in Concord, California.  There, she spoke with the sales manager who

23   convinced her to purchase the Product rather than traditional hardwood flooring.

24        20.    In making his sales pitch, the sales manager described how the Product was

25   made, discussed the quality of the materials used, and discussed the high quality of

26   manufacture.

27        21.    The sales manager informed Plaintiff Gold that the Product was harder and more

durable than real wood, and that, if she dropped a can of cat food on the Product, it would not dent, unlike hardwood, and that the Product was virtually scratch and dent resistant.

22.     The sales manager also informed Plaintiff Gold that the Product was at least two-and-a-half times stronger than Red Oak.

23.     The sales manager also informed Plaintiff Gold that the Product had a lengthy warranty but she was not given the warranty or informed of its terms before her purchase. Although Plaintiff Gold does not recall the length of the warranty, she does recall it was long and implied to her that the Product would last that length of time.

24.     In reliance on the information she had been given by Defendant, Plaintiff Gold purchased the Product and, in early October 2013, Plaintiff Gold used the services of a licensed flooring contractor to install the Product in her home.  Within weeks of installation, and while her home remained unoccupied, Plaintiff Gold observed initial defects with the Product.  She observed the Product was scratching easily and splintering.

25.     She notified Defendant by phone on October 30, 2013.  The customer service representative requested she complete a "General Disclosure Statement" to begin the claims process.  Plaintiff Gold completed the General Disclosure Statement, and mailed it to Defendant's claims department.

26.     On or about December 2, 2013, Richard King of Inspect Solutions, a company retained by Defendant, inspected the Product installed at Plaintiff Gold's home.  He drafted a report on or about December 6, 2013, in which he concluded that Plaintiff Gold and the installers were completely at fault and no Product defects existed.

27.     The Product continues to manifest defects to the present day, including warping, splitting, buckling, and shrinking.

28.     On September 4, 2014, Plaintiff Gold placed Defendant on notice of these defects via a Consumers Legal Remedies Act notice (Cal. Civil Code §1782), attached as Exhibit A hereto.

**C.     Plaintiff Emery's Factual Allegations**

1    29.    Plaintiff Emery is a West Virginia resident and owns a home located at
2  219 Picket Avenue in Inwood, West Virginia.

3    30.    Before purchasing the Product, Plaintiff Emery was prompted by a local
4  television advertisement about the cost of bamboo flooring to visit her local Martinsburg
5  Lumber Liquidators store.  At the store, she viewed samples of the Product and spoke with the
6  manager, William S. Dyess, about the Product.

7    31.    Mr. Dyess informed Plaintiff Emery that the Product was "made from the
8  hardest wood."

9    32.    Mr. Dyess provided Plaintiff Emery with a demonstration of the hardness of the
10  Product by hitting a sample of the Product with another piece of wood to demonstrate its
11  durability.

12    33.    Plaintiff Emery also reviewed a brochure about the Product and was given a six-
13  inch sample to take home with her.

14    34.    Plaintiff Emery was also told the Product had a 30 year warranty but did not
15  review the warranty terms before purchase.  She understood that the 30-year warranty implied
16  that the Product would last for that period of time.

17    35.    On July 10, 2014, in reliance on the demonstration, samples, and information
18  she had been provided by Defendant, Plaintiff Emery purchased 517 square feet of the Product
19  from Lumber Liquidators.

20    36.    On August 4, 2014, the Product was installed in her living and dining rooms and
21  two hallways.

22    37.    The installation was conducted by Falling Water Floor, who was referred to
23  Plaintiff Emery by Defendant.

24    38.    The cost of the installation was $4,794.59.

25    39.    Within only a few weeks after installation, Plaintiff Emery noticed that the
26  Product was delaminating, warping, splitting, shrinking, and scratching, and generally
27  deteriorating in various places.

40.     On four occasions, Falling Water Floor Installation had to make repairs to Plaintiff Emery's floor.

41.     On December 15, 2014, Plaintiff Emery contacted Defendant to put them on notice that her floor was failing and that Falling Water Floor's repair efforts were futile. Instead of immediately taking reasonable steps to replace Plaintiff Emery's flooring, in a letter presumably incorrectly dated "January 5, 2015," Defendant's Customer Care Team stated that they "assigned her claim to James L."

42.     The Product continues to manifest defects to the present day.

43.     Plaintiff Emery put Defendant on notice of her claim under the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6 *et seq*., in a letter dated February 10, 2015, attached as Exhibit B, hereto.

**D.     Plaintiff Ference's Factual Allegations**

44.     Plaintiff Ference is an Illinois resident and owns a home located at 1301 South Douglas Street in Springfield, Illinois.

45.     Prompted by a television advertisement for the Product, Plaintiff Ference, accompanied by her contractor, Jeff Chunes of JC Construction, visited the Springfield, Illinois Lumber Liquidators store in or around August 2014.

46.     At the store, Plaintiff Ference and her contractor spoke with a sales associate, who represented that the Product was very durable, would stand up to heavy wear, and was much harder than hardwood flooring.

47.     The sales associate also indicated that Lumber Liquidators stands behind its products and that the Product came with a warranty. The associate did not, however, review the warranty's terms with Plaintiff Ference or provide a copy for her to review prior to purchasing the Product.

48.     As purported demonstrations of the Product's durability, the sales associate tried to scratch or gouge a sample of the Product with a metal object and tried to dent a sample by hitting it with another piece of wood. The Product appeared to withstand these tests.

49.     In reliance upon Defendant's representations, Plaintiff Ference purchased the Product—to wit, Morning Star "Xiamen" strand bamboo flooring—at a cost of approximately $4,900.

50.     In the following months, JC Construction installed the Product in Plaintiff Ference's home.

51.     Within a few months of installation, Plaintiff Ference observed that the Product was warping, shrinking, gapping, and buckling.

52.     Attempting to remedy these problems, JC Construction returned to Plaintiff Ference's home on at least three occasions and reinstalled much of the flooring, but these efforts had minimal, if any, effect.

53.     In early 2015, Mr. Chunes contacted the manager of the Springfield, Illinois Lumber Liquidators store regarding the problems with Plaintiff Ference's floor.  The manager refused to assist and referred Mr. Chunes to Defendant's customer service department, to whom he then submitted a warranty claim on Plaintiff Ference's behalf.

54.     Defendant responded by denying Plaintiff Ference's claim, suggesting, in a letter dated April 17, 2015, that the problems with her flooring were attributable to humidity.

55.     The Product continues to manifest defects to the present day.

**E.     Plaintiff Norris' Factual Allegations**

56.     Plaintiff Norris is a Minnesota resident and owns a home located at 7327 West 110th Street in Bloomington, Minnesota.

57.     Before purchasing the Product, Plaintiff Norris was prompted by a local television advertisement regarding the flooring products sold at Lumber Liquidators to contact Defendant.

58.     Plaintiff Norris contacted Defendant by telephone to learn about the different flooring options.  During the call, Plaintiff Norris inquired about hardwood, laminate, and bamboo flooring.  The customer service representative advised Plaintiff Norris to purchase the Product, stating that it was the most durable option.

59.     Soon after speaking with the Defendant's customer service representative, Plaintiff Norris visited her local Lumber Liquidators store in Burnsville, Minnesota.  There, she spoke with a sales associate who explained to her that the Product is much stronger than traditional hardwood flooring.

60.     In order to demonstrate the durability of the Product, the sales associate showed Plaintiff Norris a large, approximately 6' x 8' sample of the Product, which was located next to the main entrance of the store.

61.     As part of his sales pitch, the sales associate explained that Lumber Liquidators stands behind its products and that the Product is supported by a warranty.  The sales associate, however, did not review the terms of the warranty with Plaintiff Norris or provide a copy for Plaintiff Norris to review prior to purchasing the Product.

62.     In August 2014, and in reliance on the information she had been given by Defendant over the telephone and in the store, Plaintiff Norris purchased the Product.

63.     Plaintiff Norris used the services of a licensed contractor to install the Product in her home in September 2014.

64.     Within two months of installation, Plaintiff Norris observed that the Product was cupping, shrinking, warping, and splitting.

65.     In or around November 2014, Plaintiff Norris contacted Defendant via telephone regarding the problems she was experiencing with the Product.  The customer service representative requested that Plaintiff Norris complete a "General Disclosure Statement" to begin the claims process.  Plaintiff Norris completed the General Disclosure Statement, and mailed it to Defendant's claims department.

**F.    Plaintiff Fursman's Factual Allegations**

66.     Plaintiff Fursman is Pennsylvania resident and owns a home located at 626 Trimble Boulevard in Brookhaven, Pennsylvania.

67.     Before purchasing the Product, Plaintiff Fursman visited his local Lumber Liquidators store in Claymont, Delaware on two occasions.  Plaintiff Fursman's first visit was

1    in July 2014 and his second visit was in August 2014.

2        68.    During his first visit, Plaintiff Fursman spoke with a Lumber Liquidators sales

3    representative who emphasized the high quality and durability of the Product as well as the

4    superior performance of the Product as compared to other hardwood flooring products.

5        69.    The sales representative informed Plaintiff Fursman that the Product was

6    "harder and more durable than real wood," "remarkably tougher, harder, stronger than normal

7    hardwoods," "more water resistant than normal hardwood floors," "superior and better quality

8    than other hardwoods," and "came with a thirty year warranty."

9        70.    In touting the hardness and durability of the Product, the sales representative

10    provided Plaintiff Fursman with a demonstration by hitting a sample of the Product with an

11    object, which did not dent the flooring sample.

12        71.    Plaintiff Fursman also reviewed product brochures for the Product as well as

13    other hardwood flooring products, which he took home.

14        72.    In addition, Plaintiff Fursman was given an eight to ten inch sample of the

15    Product to take home.

16        73.    Plaintiff Fursman returned to his local Lumber Liquidators store in Claymont,

17    Delaware for his second visit in August 2014.

18        74.    During this second visit, Plaintiff Fursman spoke with a Lumber Liquidators

19    sales representative who again emphasized the high quality and durability of the Product as

20    well as the superior performance of the Product as compared to other hardwood flooring

21    products.

22        75.    The sales representative reiterated the same sales pitch as the first sales

23    representative and informed Plaintiff Fursman that the Product was harder and more durable

24    than real wood, remarkably tougher, harder, stronger than normal hardwoods, more water

25    resistant than normal hardwood floors, was superior and better quality than other hardwoods,

26    and came with a thirty year warranty.

27        76.    Plaintiff Fursman was given an additional eight to ten inch sample of the

1   Product to take home.

2       77.     After completing his second visits to a Lumber Liquidators store, Plaintiff

3   Fursman reviewed the product brochures he took home as well as the information on

4   Defendant's website regarding the Product.  The information reviewed and relied upon by

5   Plaintiff Fursman included, but was not limited to, the following statements:

6           a.      "They're finely crafted to ensure they're free of defects."

7           b.      "Each Morning Star floor is manufactured to be exceptionally durable so

8   it withstands the rigors of everyday life."

9           c.      "Morning Star Bamboo is two to two-and-a-half times harder than red

10  oak, so it holds up well to "pretty much anything you can put it through."

11          d.      "To make strand bamboo, shredded bamboo fibers are compressed under

12  extreme heat and pressure.  This manufacturing process yields flooring that is even harder and

13  denser than traditional bamboo floors."

14          e.      "Morning Star Bamboo Flooring is one of the best bamboo floors on the

15  market today.  It is produced from old growth bamboo reeds that are at least 4 years old,

16  thereby increasing hardness.  Morning Star Bamboo Flooring creates a naturally beautiful and

17  ecologically friendly product that evokes a feeling of luxury."

18      78.     After his visits to his local Lumber Liquidators stores, Plaintiff Fursman also

19  reviewed the Product's limited warranty and installation instructions.

20      79.     Plaintiff Fursman also reviewed and relied on Defendant's representations that

21  its Product meets accepted industry standards, including ASTM International.

22      80.     Based on the samples, demonstration, and information provided by Defendant in

23  its brochures, on its website, and by its sales representatives, including the Product's limited

24  warranty, installation instructions, and marketing and advertising materials, Plaintiff Fursman,

25  purchased 597.30 square feet of the Product from Defendant on or around September 30, 2014.

26  He paid $2,802.54 for the Product.

27      81.     Prior to installation, and in accordance with the installation instructions, the

Product was acclimated in the room in which the Product was to be installed from date of purchase, September 30, 2014, until the last week of October 2014.

82.     After the product was properly acclimated in accordance with the installation instructions, Plaintiff Fursman installed the Product in his home's living room, dining room, and kitchen during the period of October 23-29, 2104.

83.     After installation, Plaintiff Fursman observed that the Product was excessively shrinking throughout his home.  The shrinkage was so severe that it created large gaps between the Product slats and the baseboards.  In some areas, the shrinkage produced three-inch gaps between the Product and the baseboards.

84.     On or around March 12, 2014, as a result of the excessive shrinkage of the Product, Plaintiff Fursman contacted his local Lumber Liquidators store, where he purchased the Product, regarding the defective nature of the Product.  He was instructed by his local Lumber Liquidators store to call (800) HARDWOOD and report his claim.

85.     On or around March 12, 2014, Plaintiff Fursman called (800) HARDWOOD and spoke to a Lumber Liquidators claims representative about the premature failure of the Product.

86.     On April 13, 2015, Plaintiff Fursman received a letter from Defendant's Customer Care Team indicating that his claim had been assigned to a customer care representative.

87.     Shortly thereafter, Plaintiff Fursman properly and completely filled out Defendant's warranty claim form and submitted it to Defendant along with all of the requested information and photographs of the Product.

88.     On May 11, 2015, Plaintiff Fursman received a letter from Defendant denying his warranty claim and indicating that the gapping issue he was experiencing was the result of either inadequate installation or environmental factors in his home.  The letter further stated that because the gapping is typically not a manufacturing issue, Defendant does not order an inspection of the flooring.

### G.     Plaintiff Triana's Factual Allegations

89.     Plaintiff Triana is a Florida resident and owns a home located at 24 Captiva Drive in Ponte Vedra Beach, Florida.

90.     Before purchasing the Product, Plaintiff Triana considered several retailers, who sent representatives to his home to take measurements and discuss various flooring options.

91.      With a dog living in the home and his grandchildren visiting frequently, Plaintiff Triana's most important criteria for the new floor included stability and hardness/durability.

92.     In researching various flooring materials and brands online, Plaintiff Triana looked into the Product on Defendant's website, where he recalls reading claims touting the Product's hardness relative to other flooring materials and other bamboo flooring products.

93.     In addition, Defendant's representatives with whom Plaintiff Triana spoke at his home and later at the Jacksonville, Florida store recommended the Product as the best option for his needs.

94.     These individuals represented that the Product was very stable and very hard— two-and-a-half times harder than hardwood flooring.

95.     Furthermore, they represented that the Product was "carbonized" and heat-treated, under extreme pressure, to remove natural oils in the material making it much harder than traditional bamboo flooring.

96.     A salesperson in the Jacksonville store provided a demonstration in support of these representations, hitting the Product with a hammer to show it would not dent.

97.     Plaintiff Triana also recalls representations by Defendant that the Product was protected by a 30 year warranty, though he did not receive a copy of the warranty, nor was he made aware of its specific terms, before his purchase of the Product.  However the length of the warranty implied that the Product would last.

98.     In reliance on Defendant's representations, Plaintiff Triana purchased approximately 820 square feet of the Product from the Jacksonville Lumber Liquidators store

1   in April and May 2012, at a total cost of $4,726.38.

2       99.    Defendant provided Plaintiff Triana a list of three approved contractors who

3   could install the flooring, and, based on the specific recommendation of the salesperson who

4   sold him the flooring, Plaintiff Triana selected Coastline Customs Floors, who installed the

5   flooring in his home at a total (labor) cost of $3,075.41.

6       100.    Not long after the Product was installed, Plaintiff Triana began noticing that the

7   Product was cracking, splitting, peeling, and cupping, making the floor increasingly

8   unattractive and unsafe.

9       101.    In or around January 2014, Plaintiff Triana notified Defendant of these

10   problems.  The in-store representative with whom he spoke provided no assistance.  He also

11   called Defendant's main customer service group, which responded by assigning his claim to

12   "Natasha D." and asking him to complete a "General Disclosure Statement."  Plaintiff Triana

13   filled out and returned this form on or around March 3, 2014.

14       102.    Rather than assessing Plaintiff Triana's claim based on that information or its

15   further investigation, Defendant responded that Plaintiff Triana would need to hire an inspector

16   to come to his home, assess the problems, and provide the results to Defendant (all at Plaintiff

17   Triana's own expense).

18       103.    The Product continues to manifest the aforementioned defects to the present

19   day.

20   **H.    Product Manufacturing Process and Representations**

21       104.    The Product is made by slicing bamboo into strips, cutting the strips into desired

22   widths, immersing the strips in an acid solution to eliminate sugars and starch, (in some cases)

23   staining the material, binding it together into planks using an adhesive, and finally applying a

24   curing lacquer.  Plaintiffs are informed and believe that Defendant has been manufacturing and

25   selling the Product since approximately 2008.  Defendant has sold the Product to thousands of

26   consumers throughout the United States, including California.  The Product was and is

27   marketed and sold for use in homes and other structures.

105.     Defendant concealed from and/or failed to disclose to Plaintiffs and Class Members the defective nature of the Product.

a.     Plaintiffs are informed and believe that Defendant used a variety of methods to communicate representations about the durability and quality of the Product and about its misleading warranty to the general public and contractors in the flooring installation business.  These representations were published on Internet sites such as YouTube, on Defendant's website, at trade, building, and home shows typically open to the general public and contractors who service ultimate consumers of the Product, and at Defendant's product retail stores. Defendant communicated a common and repeated theme regarding the Product:

(i)      "Morning Star Bamboo is two to two-and-a-half times harder than red oak, so it holds up well to "pretty much anything you can put it through."

(ii)     "To make strand bamboo, shredded bamboo fibers are compressed under extreme heat and pressure.  This manufacturing process yields flooring that is even harder and more dense than traditional bamboo floors."

(iii)    "Morning Star Bamboo Flooring … is produced from old growth bamboo reeds that are at least 4 years old, thereby increasing hardness.  Morning Star Bamboo Flooring creates a naturally beautiful and ecologically friendly product that evokes a feeling of luxury."

106.     Defendant states that its flooring meets accepted industry standards, stating on its website: "QUALITY GUARANTEE: This Flooring is constructed and tested to meet or exceed industry standards for emissions" -- including ASTM 4066 (wear resistance), ASTM 3359 (Finish Adhesion) and ASTM 4442 (Moisture Content).  *See* http://www.lumberliquidators.com/assets/images/product_page/Morning_Star_10023638_HS_ Str_Antique.pdf (citing various "Technical Specifications").

107.    The hardness of the Product is a misleading indicator of whether it can withstand scratching and denting better than other hardwood flooring products.

108.    Defendant knew that it did not manufacture the Product in such a way as to withstand scratching and denting better than other hardwood flooring products, such as red oak.

109.    By focusing on the hardness of the Product rather than the other factors that cause the defects experienced by Plaintiffs and Class Members, Defendant intended to mislead consumers into believing its representations that the Product "does not scratch easily" and is "virtually scratch and dent resistant." These statements were and are false and misleading because Defendant deliberately failed to disclose that factors other than hardness will result in the Product being easily scratched and dented.

110.    Defendants also failed to disclose that its manufacturing process did not create a product that could prevent scratches and dents better than other hardwood flooring products.

111.    Defendant represents that the Product meets ASTM 4442, the standard for moisture content. But ASTM 4442 actually prescribes the process for drying wood and wood particle material but does not prescribe the acceptable moisture content of the final, dried product.

112.    Indeed, bamboo, like wood flooring products, is hydroscopic, meaning it gains and loses moisture as the air around it gains and loses moisture.

113.    The typical moisture content in wood flooring products is 6% to 9%. *See* http://www.hardwoodfloorsmag.com/installation/understand-wood-floor-moisture-content-dimensional-change.html (last visited December 16, 2015); http://www.greenbuildingsupply.com/Not-All-Bamboo-is-Created-Equal (last visited December 16, 2015).

114.    By claiming that the Product meets moisture content standard ASTM 4442, Defendant is deliberately misleading consumers to believe that ASTM 4442 means that the Product's moisture content is within an acceptable range.

115.    Defendant's installation instructions provide that the Product may contain up to

1    12% moisture at installation – 3% more than the expected standard.  *See*

2    http://www.lumberliquidators.com/assets/images/installation/morning_star_clic.pdf (last visited

3    December 16, 2015).

4         116.    Defendant fails to disclose to consumers that the Product may contain an

5    elevated moisture content such that even after acclimatization it will fail of its essential purpose

6    and crack, cup, warp, gap, shrink, and otherwise degrade in a defective manner.

7         117.    Defendant continues to advertise and sell the Product for use in homes and other

8    structures, omitting to disclose to Plaintiffs and Class Members, their agents, or contractors

9    material facts concerning the Product, including, but not limited to, concealing that the Product

10   was defectively formulated, was and is susceptible to warping, splitting, shrinking, and

11   splintering, does not otherwise perform as represented, and fails far in advance of its purported

12   thirty year warranted life.  All of these facts are material to a reasonable consumer.  The

13   Product did not perform in accordance with the reasonable expectations of Plaintiffs and Class

14   Members in that it was not durable and suitable for use as a flooring system in their homes and

15   other structures.

16        118.    The Product is a manufactured wood product that is defectively designed, tested,

17   and manufactured, and will warp, buckle, splinter, and unreasonably scratch and dent when

18   used in its intended manner.  These failures are common in the Product regardless of when,

19   where, or how it is installed.

20        119.    As a result of Defendant's misconduct, Plaintiffs and Class Member have

21   suffered actual damages in that the flooring in their homes and other structures has prematurely

22   failed and will continue to do so, potentially damaging other building elements, causing

23   continuous and progressive damage to property, and requiring Plaintiffs and Class Members to

24   expend thousands of dollars to repair or replace the flooring long before the expiration of the

25   "useful life" of the Product as represented by Defendant.

26        120.    Due to the defective nature of the Product, it is not sufficiently durable to serve

27   as flooring.  The following photographs depict some of the problems Plaintiffs and others have

experienced with the Product.





121.    Because of the relatively small size of the typical damages, and the modest resources of most homeowners and of the individual Class Members, it is unlikely that most Class Members could afford to seek recovery against Defendant on their own.  A class action is therefore the only viable, economical, and rational means for Class Members to recover from Defendant for the damages they have caused.

**I.    Defendant's Knowledge of and Notice that its Flooring was Defective**

122.    Defendant is well aware of the problems related to the cracking, splitting,

warping, cupping, scratching, and denting of the Product.  It has received warranty claims and complaints from customers (like those submitted by the Named Plaintiffs).  In addition, websites such as www.mythreecents.com and www.consumeraffairs.com contain complaints about the Product dating back to 2011 and 2012 – which further continue to put the Defendant on notice concerning the defective nature of the Product.

123.    Upon information and belief, Defendant pays to be a member of www.consumeraffairs.com, which means that it is notified of each complaint and has the option of responding to each complaint.  A review of this website demonstrates that Defendant does review and respond to customer posts on www.consumeraffairs.com.

124.    The following is an example of a complaint about the Product from October 2, 2013 on www.consumeraffairs.com/homeowners/lumber_liquidators.html?page=12 (last visited December 16, 2015):

judy of Ione, CA

Oct. 2, 2013Verified Reviewer

> We purchased dark stranded bamboo flooring from Lumber Liquidators. We were very particular to request a very durable floor that would not scratch easily and had the best resistance for moisture spills etc. This flooring was highly recommended by their salesman as one of the most durable. We installed this flooring throughout our entire downstairs living room, dining room, and kitchen. This flooring now has scratches everywhere!! Scratches from everything and anything that is slid across the floor such as: unoccupied bar stools that have protective plastic caps, TV trays that were only slid forward enough to allow us to eat while sitting on the couch, and even an empty 5 gallon bucket when slid a couple of inches. There are many, many scratches all over the house and we have no idea how they got there.

> All of these scratches show up as bright white lines on the dark flooring which obviously was not treated well enough to make the surface as durable as we were told. We have no pets, no children at home, no high heels, and all of the heavy furniture have the felt pads to protect from scratching the floor. The flooring was only installed in April/May of this year. We have a thirty year warranty on the flooring and have called the Lumber Liquidators customer services department to complain about the flooring and see what they will do to honor the product warranty.

We are waiting for Lumber Liquidators to get back to us. How disappointing to spend so much money on a product recommended by Lumber Liquidators sales and yet it absolutely does not meet the standards we requested. DO NOT BUY FROM LUMBER LIQUIDATORS!!!! They sell less than quality materials!!!!

125.    The following complaints are also from www.consumeraffairs.com and relate to complaints made to Defendant between 2011 and 2013:

I purchased $6000 of morningstar bamboo from Lumber Liquidators in Jan 2012 and $3000 more in adjacent room on same floor in April 2012. Approximately 6 months after installation the $6000 floor began to show gaps and shrinkage. The 2nd installation has been trouble free. I contacted the LL store and they said not our problem. Contacted LL customer service and they told me it was my fault due to humidity levels in my home. If that were the case the $3000 floor would also show gaps and shrinkage since they are next to each other! Their salesman never mentioned any problem with this wood and humidity. Salesman said the wood was "tougher than oak". What a lie! It scratches plenty! They offered $200 on a $1000 repair contingent on me waving any future claims. What a joke![1]

Can someone please tell me if there is a group from here in Texas that is getting together to bring a class action against LL? We purchased 1200 sq. ft. of Morning Star Bamboo Flooring in November and it is cupping EVERYWHERE. We came home from being gone over the weekend and now it is actually buckling up. From EVERYTHING I have read, it is defective product we were sold and do NOT expect to get any help from LL. As of now, they have been completely useless in taking care of my problem floor. I WILL continue to go through the motions to hopefully get my money for the flooring refunded and the cost to have it pulled up reimbursed!!! I do NOT want this junk in my home. If anyone has information, please forward it to me. When you hire a lawyer for something like this, does LL have to pay the attorney or do you have to? I do NOT have the money to hire and pay an attorney.[2]

Lost first level contents and flooring from Sandy. January 2013, made purchase of 800 sq ft of Morning Star Bamboo, $3661.78. Had their installers, Palermo to home to inspect and recommend how and when to install (another $1100). Had delivery, allowed

---

[1] https://www.consumeraffairs.com/homeowners/lumber_liquidators.html?page=9 (last visited December 16, 2015).

[2] https://www.consumeraffairs.com/homeowners/lumber_liquidators.html?page=10 (last visited December 16, 2015).

floor to acclimate for specified 3-5 days. Their installers returned to install. By end of March, had some gaps. Called Lumber Liquidators, they called installers. Was assured that with full year of warranty for installation and product, allow it to go thru summer months. July noticed scratches. While scratches are normal, these were white, not the bamboo color. Made claim to LL, was told to mail balance of floor for inspection. They received, said floor not at fault, never returned floor. Dec 2013, gaps grew to over 1/2 inch, separation from walls. Called Lumber Liquidators. Made claim on Dec. 2, repeated claim on Dec 13, 2013. January 17th, began follow up and no one called us. Googled issue online. Found we were one of many. Inspections began from LL and their installers, Palermo. They agreed separation not normal - many homes in area with issue. Went to two of the LL stores. They agreed with issue and fault of floor and had numerous issues with customers and made changes to how they sell and allow acclimation of product. Three inspections were done, no issue at home cited. March inspection found moisture level now low in home. They are now blaming us. No one has record of 3 other inspections. Our gaps are all thru home from the front door on. As large as 1 inch in some spots. Unsightly and embarrassing. We had none of these issues with our floor before Sandy in its 5 year life. It is not our home, it is the product. Lumber Liquidators knows it. Every salesperson you ask in their store in my NY area cautions the purchaser not to buy this product. I don't know if the product was too wet when manufactured, or too dry or from endangered Tiger habitat as stated online, but we are so frustrated and embarrassed by our home's floor every day."[3]

I bought 1000 square feet of Morning Star Bamboo from Lumber Liquidators in November 2011 after consulting with the sales associates in the Perrysburg, OH store. We received the product, allowed it to acclimate indoors for several weeks and then had it installed by the installer recommended by the company. About one month later, the floor began to gap, snap, crackle and pop all over the place. Our installer could not be reached for some time. I called the store that referred me to corporate. The proper warranty protocol was followed and several weeks later, nothing! The customer service rep is mysteriously gone and no one will help. Unreturned phone calls and emails continue. I need to list my home to sell in the next month, meanwhile my floor is disintegrating.[4]

126.   In fact, on information and belief, Defendant started excluding any negative

---

[3] https://www.consumeraffairs.com/homeowners/lumber_liquidators.html?page=10 (last visited December 16, 2015).

[4] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html?page=14 (last visited December 16, 2015).

reviews from its own website starting in at least 2010.

127.    Other websites include similar customer complaints. For instance, on http://www.trulia.com, there is a string of complaints concerning almost immediate failure of the Product and related ignored warranty claims:

**crabbyburton, Home Buyer, Basking Ridge, NJ**

> I am having the same problem! House is bone dry- yet after 6 months our floor looks awful, the edges are cupping and the boards are the finish is bubbling and cracking. Looks awful!! I have filed a warranty claim but haven't heard back-

Fri Nov 29, 2013[5]

**somis53, Home Buyer, 11727**

> I had the exact same problem as you. I was told by the sales person that it would be great on a cement slab. Within 3 to 4 months Joints separated, floor cupped and in certain areas discolored, got very dark. When I called lumber liq. they said it shouldn't have been installed on a slab because of the moisture. They took no responsibility and blamed it on the installer. And now I'm concerned about the amount of formaldehyde it contains.[6]

Sun Mar 1, 2015

128.    Indeed, Defendant's conduct shows actual notice and knowledge of the Product's defects as it responded directly to complaints and attempted to attribute reported problems on installation issues.  For instance, in 2012, Defendant responded to a complaint posted on http://lumber-liquidators.pissedconsumer.com/buyer-beware-defective-product-lumber-liquidators-20120328308399.html (last visited December 16, 2015):

**Dir. Customer Care _ LL Mar 31, 2012**

> Sales associates answer questions and offer guidance as needed. A final choice is made by a consumer when they agree and purchase material, so staff never makes anyone buy any particular item, but advises them based on exchanges of information during the sales process. The FINAL DECISION for any flooring installation no matter where you shop comes from the installers onsite assessment

---

[5] http://www.trulia.com/voices/Remodel_and_Renovate/Has_anyone_tried_the_bamboo_floors_from_lumber_liq-51225 (last visited December 16, 2015).
[6] *Id.*.

of the project. Your installer (Joseph) is ultimately responsible for a projects needs and we noted on 3.20.12 that he never read the instructions, so the qualified installer was not properly educated to install this material as evident in your complaint. This is publicly verifiable on our website (Customer Care page) where the installation instructions can be viewed to support the above mentioned statement. Michelle from Customer Relations is well educated and capable. The dimpling is not an ongoing problem, rather the result of improper installation as noted the installer did not read this information until the problem surfaced. The instructions state (one of several examples) "Owner and installer are solely and jointly responsible for site conditions, pre-installation moisture checking of new floor and subfloor and must ensure that all conditions and specifications listed in this guide have been thoroughly met prior to Installation of hardwood floor." The installers likely upset for failing to read the document because he failed to follow direction, so this is an installation concern and we do not fix installer mistakes as we're not responsible for independent installer errors" Not [*sic*] supplier ever is. A good reputation is earned when directions are reviewed and adhered to, so we disagree with your assessment of his credentials in this case. Unfortunately, this is not a product defect but installer error meaning it's not covered under the warranty. The other product installed was obviously conducted following direction as an example of what a floor can look like when instructions are followed. Sorry to hear this happened. We sell thousands of bamboo floors each week without issue and the return business alone accounts for most of these sales. People are satisfied when the instructions are followed and this is a terrible way to learn the importance of those documents. Yes " Everyone be aware to review the warranty and the install instructions to avoid this from happening on your project. We're taking additional steps April to provide even more information about what a consumer can do to further help avoid these situations from happening. Always check installer references and oversee the project so the job meets your satisfaction within the first 25% installed at a minimum.

129.   On information and belief, to date, Defendant continues to review customer complaints online and, instead of offering reasonable remedies for customers, responds by blaming defects with the Product on care and/or installation:

**LLResponse, Just Looking, Toano, VA**

LL Response: Reviewing the dated and current postings we find a need for consumer education to understand how flooring is to be cared for before, during, and after installation. Installing flooring

without reviewing the installation instructions or failing to review the credentials of their hired installers is never recommended and leads to problems. If you rely solely on the installer to make all the project decisions on your behalf is a common mistake and complaining about board selection, quality of work and care given to the floor during the process can all be avoided by being present and overseeing the work performed. We make every effort to educate consumers and the one thing about the flooring business is all flooring products require the same type of acclimation, pre-installation testing, installation technique, proper application of the floor to include moisture protection, and finally proper ongoing maintenance of the floor to include temperature and humidity controls. A common theme with gapping concerns stems from customers refusing to install transitions for floating floor systems, or improper application of transitions such as T-moldings allowing the floor to expand and contract as designed. Application of the floor is just as important as choosing the color or style of flooring for your home. We can ask questions at the point of sale, but ultimately the installer has the final say on whether the floor type is the right one for the scope of your project. Hire a professional with the installation backed by a warranty, but know that a product warranty covers the finish wearing down to the wood layer, or core as it may be. Scratches, dents, chipping, cupping, buckling and other issues are not a covered event and point to other installation and care issues. This does not change when you shop somewhere else and the best advice is to read the warranty, follow the instructions, hire a flooring contractor not a general contractor to install your floor, and follow the care instructions. Thousands of people shop everyday with us and have a wonderful experience. Choosing the right floor and caring for it after installation leads to complete satisfaction with a warranty that covers finish wear through the period offered. Flooring requires care like any other investment, so please visit our site for more information or assistance if you have questions. It can be rather frustrating to get flooring advice from others who may not have taken the proper steps to install the floor, or care for it according to the instructions. If you need assistance please locate the Customer Care tab on the upper right hand corner of our main web page, or call 1800HARDWOOD.

Wed May 7, 2014

**LLResponse, Just Looking, Toano, VA**

The warranty does not cover scratches or dents - no flooring warranty does - this is a care issue and not something a manufacturer or seller pays for. I have a scratch on my car and don't expect Ford to pay for the repair. This is a matter of

understanding what you are responsible for versus the seller.

Wed May 7, 2014

130.     Similarly, the Better Business Bureau ("BBB") website reports that, since 2013, 819 complaints against Defendant have been resolved, and 605 complaints against Defendant remain unresolved, some of which relate to the defective nature of the Product.

131.     Like www.consumeraffairs.com, the BBB notifies Defendant of each complaint and Defendant has the option of responding to the consumer making the complaint.

132.     On information and belief, Defendant's CEO was put on notice that the company is knowingly selling a product containing defects and his response was to issue a refund without demanding the customer go through the warranty process:

> Morning Star bamboo flooring from LL seems to be a major issue. I installed 1800sqft using a licensed flooring contractor after labor day 2014. I left the product on studs inside the house in an empty room for over a month as directed by salesman at LL; with a fan blowing from the floor and ceiling fan above. I cut off the ends of the boxes also as directed. Within a week; the floor started to cup in the dining room in front of the china cabinet and is now cupping at various places throughout the house. LL customer service replied to my letter of complaint with the same reply; cupping is caused from moisture above and below the wood. We installed with MS adhesive directly to prepared concrete pad of house we just purchased. Seems to me LL is knowingly selling product that has systemic issues. I wrote to the CEO about being charged "restocking" fee on $10,000 purchase. I was not happy to be charged because I ended up with 14 extras cartons with only 1 carton that was waste. Installer wasted very little product. CEO issued a refund to us after he received a letter. In my opinion and 35 years in retail management; this is product liability. I am writing to the CEO now to voice my disgust. I also believe LL is knowingly selling "wet" NOT KILN DRIED product. 2 flooring contractors independently walked my home and stated installation was done correctly in there [*sic.*] opinion. I believe legal action will be necessary. I don't think the CEO will venture from their customer support teams reply.[7]

**J.     Defendant's Warranty Practices and Procedures Also Put Them on Notice of the Products' Defects**

---

[7] http://www.4inspirationsphotographyblog.com/suzanne-mcgrath-photograp/2013/04/a-product-review-morningstar-bamboo-click-floors.html (last visited January 16, 2015).

133.     When consumers complain to their local Lumber Liquidators store about the Product's defects, they are directed to contact the corporate customer care department for assistance.

134.     Defendant's corporate customer care department has each customer fill out a "General Disclosure Statement," which includes a description of the Product, its mill code and production date, how long it was acclimatized, whether it was installed professionally, and a description of the defects that have appeared.

135.     Defendant then determines whether to order an inspection of the flooring or not.

136.     Inevitably, Defendant determines that the defects complained of are the result of poor installation, excluded by the warranty, and denies the claim.  *See, e.g.,* ¶¶ 155, 156, 158-60, *supra*.

137.     Indeed, after this Complaint was publicized 64 comments were received, including the following two about Product purchased in 2013 that describe Defendant's practice of always blaming the consumer:

> Purchased 1400 S.F. of Morningstar carbonized strand bamboo in July 2013 and had it professionally installed by their installer. Same problems as everyone else speaks of. Worst problems are shrinking and gaps. Still continues to shrink a year and a half later. Went through entire claim process with Lumber Liquidators. Arbitrarily turned down at every step. Paid for two different professional flooring inspectors, and on their advice paid for professional re-installs of large sections twice. Shrinking and gaps continue to happen. I have detailed and contemporaneous notes on all events and conversations, and would like to be part of the class action suit.[8]

> I have had the same issue with my LL Morning Star Bamboo flooring (we had over 2000 sqft installed). The floors began to warp and buckle within 3 months after installation in October 2013. I went through the entire claim process with LL and received a letter from them informing me that the issue with my flooring has nothing to do with the product itself and everything to do with a moisture issue (despite purchasing the most expensive moisture barrier/adhesive they sell). They will take NO responsibility for

---

[8] http://topclassactions.com/lawsuit-settlements/lawsuit-news/45644-lumber-liquidators-facing-bamboo-flooring-class-action/ (last visited December 16, 2015).

anything. I have fought with the installer and my contractor, and am now purchasing new flooring and working out the rest with my contractor. I am now concerned about the formaldehyde. I have a neurological condition and cannot have this s*&t in my home!!! Please send me some information as to what I can do, and whether ALL of the flooring needs to come out.[9]

## CLASS ACTION ALLEGATIONS

138.    Plaintiffs bring this action as a class action pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the class.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements as set forth in Rule 23(a) and Rule 23(b)(3).

139.    Plaintiffs advance this action on behalf of the following classes (together, the "Class" or "Class Members"):

California Class:  All individuals in the State of California who purchased, for personal, family, or household use, Morning Star Strand Bamboo Flooring manufactured and sold by Lumber Liquidators, Inc. from January 1, 2012 to March 15, 2019. Excluded from the Class are Defendants, their legal representatives, assigns and successors and any entity in which Defendants have a controlling interest.  Also excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

Illinois Class:   All individuals in the State of Illinois who purchased, for personal, family, or household use, Morning Star Strand Bamboo Flooring manufactured and sold by Lumber Liquidators, Inc. from January 1, 2012 to March 15, 2019. Excluded from the Class are Defendants, their legal representatives, assigns and successors and any entity in which Defendants have a controlling interest.  Also excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

West Virginia Class:  All individuals in the State of West Virginia who purchased, for personal, family, or household use, Morning Star Strand Bamboo Flooring manufactured and sold by Lumber Liquidators, Inc. from January 1, 2012 to March 15, 2019. Excluded from the Class are Defendants, their legal representatives, assigns and successors and any entity in which Defendants have a controlling interest.  Also excluded is the judge

---

[9] *Id.*

NO. 3:14-CV-05373-RS–SIXTH AMENDED CLASS ACTION COMPLAINT                    27

to whom this case is assigned and any member of the judge's immediate family and judicial staff.

Minnesota Class:  All individuals in the State of Minnesota who purchased, for personal, family, or household use, Morning Star Strand Bamboo Flooring manufactured and sold by Lumber Liquidators, Inc. from January 1, 2012 to March 15, 2019. Excluded from the Class are Defendants, their legal representatives, assigns and successors and any entity in which Defendants have a controlling interest.  Also excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

Pennsylvania Class:  All individuals in the State of Pennsylvania who purchased, for personal, family, or household use, Morning Star Strand Bamboo Flooring manufactured and sold by Lumber Liquidators, Inc. from January 1, 2012 to March 15, 2019. Excluded from the Class are Defendants, their legal representatives, assigns and successors and any entity in which Defendants have a controlling interest.  Also excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

Florida Class:   All individuals in the State of Florida who purchased, for personal, family, or household use, Morning Star Strand Bamboo Flooring manufactured and sold by Lumber Liquidators, Inc. from January 1, 2012 to March 15, 2019. Excluded from the Class are Defendants, their legal representatives, assigns and successors and any entity in which Defendants have a controlling interest.  Also excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

National Class:  All individuals in the United States who purchased, for personal, family, or household use, Morning Star Strand Bamboo Flooring manufactured and sold by Lumber Liquidators, Inc. from January 1, 2012 to March 15, 2019. Excluded from the Class are Defendants, their legal representatives, assigns and successors and any entity in which Defendants have a controlling interest. Also excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

Claims for personal injury are specifically excluded from the Class.

140.   Numerosity (Rule 23(a)(1)).  Although the actual size of the Classes is uncertain, Plaintiffs are informed and believes the Classes are comprised of many of thousands

of property owners, making joinder impractical.  The disposition of the claims of these Class Members in a single class action will provide substantial benefits to all parties and to the Court.

141.    <u>Communality (Rule 23(a)(2))</u>.  There exist questions of law and fact common to all Class Members.  Common questions include, but are not limited to, the following:

a.      Whether the Product is subject to premature failure well in advance of its represented thirty-year useful life;

b.      Whether the Product is not suitable for use as a long-term flooring product;

c.      Whether Defendant knew, or should have known, of the defective nature of the Product before making available for purchase and use by the Plaintiffs and Class Members;

d.      Whether Defendant failed to disclose to Plaintiffs and Class Members the defective nature of the Product;

e.      Whether Defendant, through making misleading representations of material facts regarding the Product's hardness and omitting other material facts regarding the particular susceptibility of the Product to cupping, warping, scratching, denting, and other defects, had a duty to disclose full information regarding the Product's characteristics;

f.      Whether Defendant's failure to disclose material facts violated Business Professions Code Section 17200;

g.      Whether Defendant's warranty practices, by excluding the types of defects alleged herein and by repeatedly concealing the true nature of the defects in the Product through the use of diversionary tactics and false investigative reports, violated Business & Professions Code Section 17200;

h.      Whether Defendant's failure to inform purchasers that the Product was susceptible to the failures alleged herein was a material omission, the nondisclosure of which was a deceptive sales practice under the consumer protection statutes of applicable state law;

i.      Whether Defendant owed a duty to Plaintiffs and Class Members to

exercise reasonable and ordinary care in the testing, design, production, manufacturing, warranting and marketing of the Product;

j.   Whether Defendant breached its duties to the Plaintiffs and Class Members by designing, manufacturing, producing, marketing, advertising, and selling defective flooring to Plaintiffs and Class Members;

k.   Whether Defendant had a duty to Plaintiffs and Class Members to disclose the true nature of the Product;

l.   Whether the facts not disclosed by Defendant to Plaintiffs and Class Member are material facts;

m.   Whether Defendant knew, or should have known that the Product would prematurely fail, is not suitable for use as flooring in residences or businesses, and is otherwise is not as represented by Defendant;

n.   Whether Defendant violated California's Consumers Legal Remedies Act (California Civil Code § 1750 *et seq.*), when it concealed, made partial misleading representations, or failed to disclose the true nature of the Product, and led consumers to believe, through its advertising, warranties, and other express representations that the Product had characteristics that it did not actually have, and that the warranty was not a finished surfaces only warranty;

o.   Whether, in committing the acts alleged herein, Defendant engaged in unfair competition and in an unfair business practice or practices within the meaning of California Business and Professions Code § 17200;

p.   Whether such acts or practices were illegal, unfair, or fraudulent within the meaning of California Business and Professions Code § 17200;

q.   Whether Defendant is liable for breach of implied warranty;

r.   Whether Defendant is  liable for non-disclosure;

s.   Whether Plaintiffs and Class Members are entitled to compensatory damages, restitution, and the amounts thereof respectively;

1    t.    Whether Defendant should be declared financially responsible for

2 notifying all Class Members of the defective Product and for the costs and expenses of repair

3 and replacement of all defective flooring materials and providing restitution of monies paid and

4 inadequate value given;

5    u.    Whether Defendant should be ordered to disgorge, for the benefit of

6 Class Members, all or part of their ill-gotten profits received from the sale of defective Product

7 and/or to make full restitution to Plaintiffs and Class Members; and

8    v.    Whether Defendant should be enjoined from continuing to market the

9 Product, as defined herein, utilizing misleading misrepresentations and omission of material

10 facts.

11    142.    <u>Typicality (Rule 23(a)(3))</u>.  The claim of the representative Plaintiffs are typical

12 of the claims of Class Members, in that the representative Plaintiffs, like all Class Members,

13 own a structure in which the defective Product was installed and failed prematurely.  The

14 representative Plaintiffs, like all Class Members, have suffered a common injury:  Plaintiffs

15 will incur the cost of repairing and/or replacing the defective Product in their homes and

16 repairing any resultant consequential damage to other building components.  The factual basis

17 of Defendant's misconduct is common to all Class Members.

18    143.    <u>Adequacy (Rule 23(a)(4))</u>.  Plaintiffs will fairly and adequately represent and

19 protect the interests of the Class.  Plaintiffs have retained counsel with substantial experience in

20 prosecuting consumer class actions, including actions involving defective building products,

21 failure to disclose material information regarding product performance, and violation of

22 consumer protection statutes.  Plaintiffs and their counsel are committed to vigorously

23 prosecuting this action on behalf of the Class and have the financial resources to do so.  Neither

24 Plaintiffs nor their counsel have any interests adverse to those of the Class.

25    144.    <u>Predominance of Common Questions (Rule 23(b)(3))</u>.  Common questions of

26 law and fact predominant over any questions involving individualized analysis.

27 Fundamentally, there are no material questions of fact or law that are not common to Class

1    Members. Common issues of fact include:  All Class Members purchased the same Product and

2    received the same misrepresentations, evasions, and omissions.  The performance of the

3    Product relative to its represented qualities is a common question, as is the Defendant's

4    knowledge regarding the Product performance and Defendant's uniform omission to Class

5    Members of these material facts.  Common questions of law include whether Defendant's

6    conduct violates California's consumer protection statutes and other law, and the Class

7    Members' entitlement to damages and remedies.

8         145.   Superiority (Rule 23(b)(3)).  Plaintiffs and Class Members have all suffered and

9    will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful

10   conduct.  A class action is superior to other available methods for the fair and efficient

11   adjudication of the subject controversy.  Because of the relatively small size of the individual

12   Class Members' claims, most Class Members likely would find the cost of litigating their

13   individual claims to be prohibitive and will have no effective remedy at law.  Thus, absent a

14   class action, Class Members will continue to incur damages and Defendant's misconduct will

15   proceed without remedy.  The class treatment of common questions of law and fact is also

16   superior to multiple individual actions or piecemeal litigation in that it conserves the resources

17   of the courts and the litigants and promotes consistency and efficiency of adjudication.  There

18   is no impediment to the management of this action because of the virtual identity of the

19   common questions of law and fact to all Class Members.

20        146.   Injunctive Relief (Rule 23(b)(2)).  Defendant has engaged and continues to

21   engage in business practices which are unfair, unlawful, and/or fraudulent in violation of

22   California's Unfair Competition Law (Business & Professions Code §§ 17200 *et seq.*) and the

23   False Advertising Law (Business & Professions Code §§ 17500 *et seq.*) by, among other things,

24   advertising and representing that the Product has characteristics and benefits that it does not.

25        147.   Plaintiffs seek class-wide injunctive relief on grounds consistent with the

26   standards articulated in Rule 23(b)(2) that establish final injunctive relief as an appropriate

27   class-wide remedy, in that Defendant continues to advertise the Product, continues to provide

1  half-truths and misleading information about the Product, and continues to omit to disclose

2  material facts regarding the Product.

3  **ESTOPPEL FROM PLEADING THE STATUTE OF LIMITATIONS**

4  148.   Defendant knew or reasonably should have known that the Product was

5  defective before its sale.  Defendant intentionally concealed material truths and disclosed half-

6  truths while at the same time concealing material information that would have corrected

7  consumers' perceptions, concerning the Product from the general public and Class Members,

8  while continuing to falsely represent that the Product is fit for its intended use.

9  149.   Defendant affirmatively represented to the general public the Product carried a

10  thirty-year (30) warranty.  Through these representations, Defendant created a reasonable

11  expectation among ordinary consumers and in the construction trades that the Product would

12  have a useful life of at least thirty (30) years.

13  150.   Defendant's acts of fraudulent concealment also include, but are not limited to,

14  using improper warranty tactics and commissioning sham inspections of Class Members'

15  flooring in response to complaints in order to mislead consumers as to the cause of the

16  Product's failures and the true nature of the Product defects.

17  151.   Based upon Defendant's misrepresentations and concealment, Defendant is

18  equitably estopped from asserting a statute-of-limitations defense.

19  152.   Alternatively, to the extent Defendant pursued a common policy of diverting

20  warranty claims or other consumer complaints about the Product through misleading and

21  erroneous investigation, or delaying tactics that induced Plaintiffs or Class Members to not

22  assert their rights in a timely manner, Defendant is equitably estopped from asserting a statute-

23  of-limitations defense.

24  **FIRST CAUSE OF ACTION**
**(Violation of Consumers Legal Remedies Act ("CLRA"))**

25

26  153.   Plaintiffs hereby incorporate by reference the allegations contained in all

27  preceding paragraphs of this complaint.

1    154.    Defendant and the Doe Defendants are "persons" as defined by California Civil

2    Code §1761(c).

3    155.    Defendant engaged in unfair competition or unfair or deceptive acts or practices

4    in violation of California Civil Code §1770(a)(5) and (a)(7) when Defendant represented,

5    through its advertising and other express representations, that the Product had benefits or

6    characteristics that it did not actually have and when Defendant made misleading statements

7    about the Product's hardness without further disclosing that factors other than the Product's

8    hardness can lead to the Product easily scratching and denting and manifesting other defects

9    complained of by Plaintiffs and Class Members.  Defendant further violated the CLRA when

10   Defendant falsely represented that the Product was of a particular standard or quality.  Finally,

11   Defendant violated the CLRA when it advertised the Product with the intent not to sell it as

12   advertised.

13   156.    Defendant's deceptive practices were specifically designed to induce Plaintiffs

14   and Class Members to purchase the Product.  Defendant's installation instructions were

15   inadequate for use with the product, resulting in the damage claims asserted herein. Defendant

16   engaged in marketing efforts as detailed in the general allegations, to reach Class Members,

17   their agents, and/or third parties on whom they relied to persuade them to purchase and install

18   the Product manufactured by Defendant, or to purchase homes and other structures in which the

19   defective Product manufactured by Defendant has been installed.

20   157.    To this day, Defendant continues to engage in unlawful practices in violation of

21   the CLRA.  Defendant continues to conceal the defective nature of the Product, make

22   misleading statements about the Product, and has omitted to disclose, on inquiry from Plaintiffs

23   and Class Members, the Product's defective propensities.

24   158.    Plaintiffs served Defendant with notice of their violation of the CLRA by

25   serving notice on their General Counsel by certified mail to their corporate offices, on

26   September 4, 2014.  A copy of this notice is attached hereto as Exhibit A.

27   WHEREFORE, Plaintiffs on behalf of themselves and for all others similarly situated,

demand a permanent injunction be issued against Defendant to refrain from continued advertising of the Product at issue herein that omits material facts about product performance, injunctive relief forcing Defendant to replace and repair all Product at issue herein for Class Members, consequential damages for Class Members who have replaced or will replace the Product at issue herein, plus costs and attorneys' fees pursuant to California Civil Code §1780(d).

## SECOND CAUSE OF ACTION
### (Violation of Unfair Competition Law- Unlawful Business Practice)

159.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

160.    California Business and Professions Code §17200 *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

161.    Defendant engaged in unlawful business practices in that Defendant represented, through its advertising, warranties, and other express representations that the Product had characteristics it did not actually have and provided misleading information to Plaintiffs and Class Members about the Product while omitting to disclose information about other characteristics of the Product that cause it to scratch and dent easily and manifest other defects.

162.    Defendant violated § 17200 when Defendant falsely represented the Product was of a particular standard or quality, including representations that the Product met industry standards, "virtually scratch and dent resistant," and "two to two and a half times harder than red oak." Defendant further violated the Unfair Competition Law when it unlawfully tested, designed, manufactured, formulated, sold, and introduced in the stream of commerce for purchase by Plaintiffs, Class Members, and the general public, the defective Product.

163.    Defendant's deceptive practices constitute an unlawful business practice in that the practices were specifically designed to induce Plaintiffs, Class Members, and their agents or third parties upon whom Plaintiffs and Class Members' relied to provide appropriate guidance regarding suitable flooring products, to purchase on Class Members' behalf the Product and

1   install the Product, recommend the use of the Product, or to purchase homes and other

2   structures in which the Product has been installed.

3       164.    To this day, Defendant has engaged and continues to engage in unlawful

4   business practices by concealing the defective nature of the Product and have knowingly

5   misrepresented to Class Members the Product possess qualities and characteristics it does not

6   have.

7       165.    As a direct and proximate cause of Defendant's unfair and unlawful methods of

8   competition and unfair, deceptive or unlawful acts or practices, Plaintiffs and Class Members

9   have suffered actual damages in that they own homes and other structures on which defective

10  Product is or was installed.  The Product has failed and will continue to prematurely fail due to

11  its poor design, poor manufacture, and unsuitability for its intended purpose, which will require

12  (or has already required) Plaintiffs and Class Members to incur costs to prematurely repair

13  and/or replace their floorings.

14      166.    As a proximate result of their unlawful, unfair, or fraudulent practices,

15  Defendant has been unjustly enriched and should be required to make restitution to the

16  Plaintiffs and Class Members pursuant to §§ 17203 and 17204 of the California Business &

17  Professions Code.

18      WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated,

19  demand judgment against Defendant, and each of them, for restitution and/or disgorgement of

20  funds paid to Defendant by Plaintiffs and Class Members to purchase the Product, or the value

21  of the product in their home or structure, or in the form of repair and/or replacement of the

22  defective Product on the Class Members' homes and other structures.

### THIRD CAUSE OF ACTION
### (Violation of Unfair Competition Law – Unfair Business Practice)

23
24      167.    Plaintiffs hereby incorporate by reference the allegations contained in all
25  preceding paragraphs of this complaint.
26
27      168.    Defendant engaged in an unfair business practice by failing to disclose material

---

facts concerning the Product, and representing, through advertising, warranties and other representations that the Product had particular qualities, including, that the Product met industry standards, "does not scratch easily," and is "two to two and a half times harder than red oak," all qualities that were inconsistent with Defendant's knowledge of Product performance.

169.    Defendant's "unfair" practices were designed to induce Plaintiffs and Class Members, or their agents, and/or third parties upon whom Plaintiffs and Class Members relied to provide appropriate flooring products, to purchase and install the Product, recommend the use of the Product, or to purchase homes and other structures on which the Product has been installed.

170.    To this day, Defendant has failed to disclose facts concerning the Product performance, facts that would be and are material to the consumer or those third parties, such as flooring contractors and general contractors, on whom the consumer relies.

171.    As a direct and proximate cause of Defendant's unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered actual damages in that they own homes and other structures in which defective Product is or was installed.  The Product will prematurely fail due to inadequate product testing, poor design and/or manufacturing techniques, and poor installation guidelines, which will require Plaintiffs and Class Members to incur costs to prematurely repair and/or replace their flooring.

## FOURTH CAUSE OF ACTION
### (Violation of Illinois Consumer Fraud and Deceptive Business Practices Act)

172.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

173.    The conduct described in this Complaint constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* (the "CFA"), and substantially similar state consumer protection statutes.

174.    Defendant engaged in unfair or deceptive practices in violation of the CFA when

1    it (1) represented that the Product was ASTM acceptable when, at best, it lacked credible

2    evidence to support those claims, and, at worst, knew the Product would fail prematurely, was

3    not suitable for use as flooring, and otherwise was not as warranted and represented by

4    Defendant; (2) failed to disclose to, or concealed from, consumers, installers, and distributors

5    material facts about the defective nature of the Product; (3) failed to disclose its own

6    knowledge of the defective nature of the Product; and (4) limited its warranty obligations in an

7    unfair and unconscionable way in light of its failure to disclose the defective nature of the

8    Product.

9         175.   Defendant either knew or should have known its Product was defective, would

10   fail prematurely, and was not as warranted and represented by Defendant.

11        176.   Defendant's conduct and omissions described herein repeatedly occurred in

12   Defendant's trade or business and were capable of deceiving a substantial portion of the

13   consuming public.

14        177.   The facts concealed or not disclosed by Defendant are material facts in that

15   Plaintiff Ference, Illinois Class Members, and any reasonable consumer would have considered

16   those facts important in deciding whether to purchase the Product or purchase homes or

17   structures with flooring applying the Product.  Had Plaintiff Ference and Illinois Class

18   Members known the Product was defective (and did not meet ASTM or other flooring industry

19   standards), they would not have purchased the Product or they would have either negotiated

20   additional warranty coverage, negotiated a lower price to reflect the risk or simply avoided the

21   risk all together by purchasing different flooring products.

22        178.   Defendant intended that Plaintiff Ference and Illinois Class Members would rely

23   on the deception by purchasing its Product, unaware of the undisclosed material facts.

24   Defendant knew that Plaintiff Ference and Illinois Class Members would rely on its product

25   literature and advertisements, statements made by its salespeople and other representations.

26   This conduct constitutes consumer fraud within the meaning of the various consumer protection

27   statutes.

1    179.    Defendant's unlawful conduct is continuing, with no indication that Defendant

2    will cease.

3    180.    As a direct and proximate result of the deceptive, misleading, unfair, and

4    unconscionable practices of Defendant set forth above, Plaintiff Ference and Illinois Class

5    Members are entitled to actual damages, compensatory damages, penalties, and attorney's fees

6    and costs as set forth in Section 10a of the CFA.

7    181.    The Defendant's deceptive, misleading, unfair and unconscionable practices set

8    forth above were done willfully, wantonly and maliciously entitling Plaintiff Ference and

9    Illinois Class Members to an award of punitive damages.

10    WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
11
**(Violation of Pennsylvania Unfair Trade Practices & Consumer Protection Law)**
12
    182.    Plaintiffs hereby incorporate by reference the allegations contained in all

13
14    preceding paragraphs of this complaint.

15    183.    This Count is brought by Plaintiff Fursman on behalf of himself and

16    Pennsylvania Class Members.

17    184.    At all times relevant hereto, Plaintiff Fursman and Pennsylvania Class Members

18    were "persons" within the meaning of 73 P.S. § 201-2(3).

19    185.    Defendant's conduct, as alleged herein, constituted unfair or deceptive acts or

20    practices and unfair methods of competition in trade or commerce (within the meaning of

21    73 P.S.§ 201-2(4)), in violation of 73 P.S. § 201-3, and regulations promulgated thereunder,

22    including the following types of conduct specified in 73 P.S. § 201-2:

23    a.    Representing that goods or services have characteristics or ingredients

24    that they do not have (§ 201-2(vi));

25    b.    Representing that goods are of a particular standard, quality or grade, if

26    they are of another (§ 201-2(vii));

27    c.    Advertising goods or services with intent not to sell them as advertised

1    (§ 201-2(ix)); and

2         d.    Engaging in fraudulent or deceptive conduct that creates a likelihood of

3    confusion or misunderstanding (§ 201-2(xxi)).

4        186.   Defendant's unfair and deceptive acts and practices (including conduct

5    prohibited by the provisions cited in subparagraphs (a) through (e) above), as alleged in greater

6    detail herein, include, but are not limited to:  (1) representations that the Product was more

7    water resistant than hardwood when, at best, it lacked credible evidence to support those

8    claims, and, at worst, knew the Product would fail prematurely, was not suitable for use as

9    flooring, and otherwise was not as represented by Defendant; (2) failed to disclose to, or

10   concealed from, consumers, installers, and distributors material facts about the defective nature

11   of the Product; and (3) failed to disclose its own knowledge of the defective nature of the

12   Product.

13       187.   As a result of Defendant's unfair and deceptive acts and practices, Plaintiff

14   Fursman and Pennsylvania Class Members have suffered ascertainable losses of money or

15   property within the meaning of 73 P.S. § 201-9.2, which they seek for restitution and/or

16   disgorgement of funds paid to Defendant by Plaintiff Fursman and Pennsylvania Class

17   Members to purchase the Product, or the value of the product in their home or structure, or in

18   the form of repair and/or replacement of the defective Product on Plaintiff Fursman's and

19   Pennsylvania Class Members' homes and other structures.

20       188.   Plaintiff Fursman and Pennsylvania Class Members are entitled to recover these

21   actual damages or statutory damages of $100, whichever is greater, plus multiple damages.

22
23   

**SIXTH CAUSE OF ACTION**
**(Violation of Minnesota Consumer Fraud Act, M.S.A. § 325F.68, *et seq.*)**

24       189.   Plaintiffs hereby incorporate by reference the allegations contained in all

25   preceding paragraphs of this complaint.

26       190.   This Count is brought by Plaintiff Norris on behalf of herself and Minnesota

27   Class Members.

191.   At all times relevant hereto, Defendant was a "person" within the meaning of M.S.A. § 325F.68(3).

192.   Defendant's conduct, as alleged herein, constitutes unlawful practices, in violation of M.S.A. § 325F.69 subd. 1, including fraud, false pretense, false promises, misrepresentations, misleading statements, and/or deceptive practices, with the intent that others rely thereon, in connection with the sale of the Product to Plaintiff Norris and Minnesota Class Members.

193.   Defendant's unlawful practices (including fraud, misrepresentation, and deceptive practices prohibited by § 325F.69 subd. 1)), as alleged in greater detail herein, include, but are not limited to: (1) representations that the Product was not suitable for use as flooring, and otherwise was not as warranted and represented by Defendant; (2) failed to disclose to, or concealed from, consumers, installers, and distributors material facts about the defective nature of the Product; and (3) failed to disclose its own knowledge of the defective nature of the Product.

194.   As a result of Defendant's fraud, misrepresentation, and deceptive practices, Plaintiff Norris and Minnesota Class Members have suffered injury within the meaning of M.S.A. § 8.31 subd. 3a, which they seek restitution and/or disgorgement of funds paid to Defendant by Plaintiff Norris and Minnesota Class Members to purchase the Product, or the value of the Product in their home or structure, or in the form of repair and/or replacement of the defective Product on Plaintiff Norris' and Minnesota Class Members' homes and other structures.

195.   Plaintiff Norris and Minnesota Class Members also seek injunctive relief pursuant to M.S.A. § 8.31 subd. 3a, directing Defendant to cease the unlawful practices alleged herein and to issue corrective statements and advertising.

196.   Plaintiff Norris and Minnesota Class Members are entitled to bring an action for damages and injunctive under M.S.A. § 8.31 subd. 3a, because this action has a public benefit. The public benefit of this action is demonstrated by at least the following:

a.      This action seeks injunctive relief in order to stop Defendant from continuing to engage in the fraud, false pretense, false promises, misrepresentations, misleading statements, and/or deceptive practices alleged herein, and to issue corrective statements and advertising, in an effort to protect Minnesota Class Members and members of the public; and

b.      Members of the public have been and are concerned about the quality and safety of the Product, as evidenced by, among other things, the thousands of complaints by consumers that can be found on the Internet regarding its defective nature.

### SEVENTH CAUSE OF ACTION
**(Violation of West Virginia's Consumer Credit and Protection Act,
W. Va. Code §§ 46A-6 *et seq.*)**

197.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

198.    Defendant published, disseminated and/or circulated oral and written information and matter that tended to and/or did induce, directly and indirectly West Virginia residents, including Plaintiff Emery and West Virginia Class Members to enter into contracts and agreements to purchase the Product.

199.    Defendant, acting directly or by agents, servants, employees, conspirators and/or joint ventures set about to sell, offer for sale, and attempt to sell in West Virginia, for cash or credit, the Product.

200.    That the defendants acting as aforesaid set about to and did engage in unfair methods of competition and unfair or deceptive practices as set forth in West Virginia Code 46-A-6-102, including, but not limited to:

The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;

Advertising, printing, displaying, publishing, distributing, or broadcasting, or causing to be advertised, printed, displayed,

published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods…which is false, misleading, or deceptive, or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive;

Engaging in any other conduct which similarly creates a likelihood of confusion of misunderstanding.

201.    That the acts and conduct above violated West Virginia Code, Chapter 46A, Article 6, Section 101, *et seq.* in that Defendant engaged in unfair and deceptive acts or practices, including, but not limited to, engaging in part of a scheme or plan to sell the Product to the public without disclosing that it was not made from the "hardest wood," that bamboo is not a wood but is actually a grass that is fibrous and flooring made from it is susceptible to scratching and denting, and that the Product was not otherwise free from defects.  These acts and practices had the capacity to deceive a substantial portion of the public.

202.    As a proximate result of the violation by defendants of the aforesaid statute, Plaintiff Emery and West Virginia Class Members suffered an ascertainable loss of money or property and Plaintiff Emery and West Virginia Class Members are entitled to recover damages all as provided in West Virginia Code, 46A-6-106.

**EIGHTH CAUSE OF ACTION**
**(Violation of Florida's Deceptive and Unfair Trade Practices Act**
**Florida Statute § 501.201 *et seq.* ("FDUTPA"))**

203.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

204.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*  The stated purpose of this Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id.* §501.202(2).

205.    Plaintiff Triana and Florida Class Members are "consumers" and the transactions at issue in this complaint constitute "trade or commerce" as defined by FDUTPA.

1   *See id*. § 501.203(7)-(8).

2       206.    FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable

3   acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or

4   commerce." *Id*. § 501.204(1)

5       207.    Defendant violated FDUTPA by representing to Plaintiff Triana and Florida

6   Class Members that the Product had particular qualities, including that the Product was "two-

7   and-a-half times harder than hardwood flooring," and, by virtue of being "carbonized" and/or

8   treated "under extreme heat and pressure," was "much harder than traditional bamboo"—when

9   in fact Defendant knew that the Product did not possess these qualities.

10      208.    Furthermore, Defendant employed fraud, deception, false promise,

11  misrepresentation, and the knowing concealment, suppression, or omission of material facts in

12  its sale and advertisement of the Product in the State of Florida by: (1) representing that the

13  Product was ASTM acceptable when, at best, Defendant lacked credible evidence to support

14  those claims, and, at worst, Defendant knew the Product would fail prematurely and was not

15  suitable for use as flooring; (2) failing to disclose to, or concealing from, consumers, installers,

16  and distributors material facts about the defective nature of the Product; and (3) failing to

17  disclose its own knowledge of the defective nature of the Product.

18      209.    Plaintiff Triana and the Florida Class Members directly or indirectly relied upon

19  Defendant's representations regarding the quality of the Product in their purchase decisions.

20      210.    Plaintiff Triana and the Florida Class Members were misled by Defendant's

21  misrepresentations and omissions because they believed that the Product was harder, stronger,

22  more durable, and more stable than other flooring materials and other bamboo flooring

23  products.

24      211.    As a direct and proximate result of the FDUTPA violations described above,

25  Plaintiff Triana and the Florida Class Members have been injured in that they purchased the

26  defective Product or purchased homes or other structures with the defective Product, based on

27  the misrepresentations and nondisclosures of material facts alleged above.

212.   Had Plaintiff Triana and the Florida Class Members known the defective nature of the Product and the truth concerning Defendant's claims, they would not have purchased or would not have paid what they did for the Product or their structures.

213.   As a result of Defendant's practices in violation of FDUTPA, Plaintiff Triana and Florida Class Members suffered an ascertainable loss in the form of monies paid to Defendant for the Product that, contrary to Defendant's representations, prematurely failed.

214.   Accordingly, Plaintiff Triana and Florida Class Members are entitled to such damages, as well as equitable relief, costs, reasonable attorney's fees, and other relief, as are permitted under the law.

### NINTH CAUSE OF ACTION
### (Violation of the Consumer Protection Acts of 50 States and the District of Columbia)

215.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

216.   Plaintiffs bring this claim on behalf of the Classes for violation of the consumer protection acts of each of the States of the United States, and the District of Columbia.

217.   Plaintiffs bring these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

218.   The following consumer protection acts are collectively referred to herein as the "Consumer Protection Acts":

(a)   ALA. CODE § 8-19-1 et seq. (Alabama);

(b)   ALASKA STAT. ANN. § 45.50.471 et seq. (Alaska);

(c)   ARIZ. REV. STAT. ANN. § 44-1521 et seq. (Arizona);

(d)   ARK. CODE ANN. § 4-88-101 et seq. (Arkansas);

(e)   CAL. BUS. & PROF. CODE § 17200 et seq. and CAL. CIV. CODE §1750 et seq. (California);

1    (f)    COLO. REV. STAT. ANN. § 6-1-101 et seq. (Colorado);

2    (g)    CONN. GEN. STAT. ANN. § 42-110a et seq. (Connecticut);

3    (h)    DEL. CODE ANN. tit. 6, § 2511 et seq. (Delaware);

4    (i)    D.C. CODE ANN. § 28-3901 et seq. (District of Columbia);

5    (j)    FLA. STAT. ANN. § 501.201 et seq. (Florida);

6    (k)    GA. CODE ANN. § 10-1-370 et seq. and GA. CODE ANN. § 10-1-390 et seq.

7           (Georgia);

8    (l)    HAW. REV. STAT. ANN. § 480-1 et seq. and HAW. REV. STAT. ANN. §

9           481A-1 et seq. (Hawai'i);

10   (m)    IDAHO CODE ANN. § 48-601 et seq. (Idaho);

11   (n)    815 ILCS 505/1 et seq. (Illinois);

12   (o)    IND. CODE ANN. § 24-5-0.5-0.1 et seq. (Indiana);

13   (p)    IOWA CODE § 714.16 et seq.

14   (q)    KAN. STAT. ANN. § 50-623 et seq. (Kansas);

15   (r)    KY. REV. STAT. ANN. § 367.110 et seq. (Kentucky);

16   (s)    LA. STAT. ANN. § 51:1401 et seq. (Louisiana);

17   (t)    ME. REV. STAT. tit. 5, § 205-A et seq. (Maine);

18   (u)    MD. CODE ANN., COM. LAW § 13-101 et seq. (Maryland);

19   (v)    MASS. GEN. LAWS ANN. ch. 93A, § 1 et seq. (Massachusetts);

20   (w)    MICH. COMP. LAWS ANN. § 445.901 et seq. (Michigan);

21   (x)    MINN. STAT. ANN. § 325F.68 et seq., MINN. STAT. ANN. § 325D.09 et seq.,

22          MINN. STAT. ANN. § 325D.43 et seq., and MINN. STAT. ANN. § 325F.67

23          (Minnesota);

24   (y)    MISS. CODE ANN. § 75-24-1 et seq. (Mississippi);

25   (z)    MO. ANN. STAT. § 407.010 et seq. (Missouri);

26   (aa)   MONT. CODE ANN. § 30-14-101 et seq. (Montana);

27   (bb)   NEB. REV. STAT. ANN. § 59-1601 et seq. (Nebraska);

(cc)   NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN. §598.0903 et seq. (Nevada);

(dd)   N.H. REV. STAT. ANN. § 358-A:1 et seq. (New Hampshire);

(ee)   N.J. STAT. ANN. § 56:8-1 et seq. (New Jersey);

(ff)   N.M. STAT. ANN. § 57-12-1 et seq. (New Mexico);

(gg)   N.Y. GEN. BUS. LAW. § 349 et seq. (New York);

(hh)   N.C. GEN. STAT. ANN. § 75-1 et seq. (North Carolina);

(ii)   N.D. CENT. CODE ANN. § 51-15-01 et seq. (North Dakota);

(jj)   OHIO REV. CODE ANN. § 1345.01 et seq. (Ohio);

(kk)   OKLA. STAT. ANN. tit. 15, § 751 et seq. (Oklahoma);

(ll)   OR. REV. STAT. ANN. § 646.605 et seq. (Oregon);

(mm)   73 PA. STAT. ANN. § 201-1 et seq. (Pennsylvania);

(nn)   6 R.I. GEN. LAWS ANN. § 6-13.1-1 et seq. (Rhode Island);

(oo)   S.C. CODE ANN. § 39-5-10 et seq. (South Carolina);

(pp)   S.D. CODIFIED LAWS § 37-24-1 et seq. (South Dakota);

(qq)   TENN. CODE ANN. § 47-18-101 et seq. (Tennessee);

(rr)   TEX. BUS. & COM. CODE ANN. § 17.41 et seq. (Texas);

(ss)   UTAH CODE ANN. § 13-11-1 et seq. (Utah);

(tt)   VT. STAT. ANN. tit. 9, § 2451 et seq. (Vermont);

(uu)   VA. CODE ANN. § 59.1-196 et seq. (Virginia);

(vv)   WASH. REV. CODE ANN. § 19.86.010 et seq. (Washington);

(ww)   W.VA. CODE ANN. § 46A-6-101 et seq. (West Virginia);

(xx)   WIS. STAT. ANN. § 100.20 (Wisconsin); and

(yy)   WYO. STAT. ANN. § 40-12-101 et seq. (Wyoming).

219.   Plaintiffs and the Class members have standing to assert claims under the Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts and Defendant's practices were addressed to the market generally and

1   otherwise implicate consumer protection concerns.

2   220.   Defendant has engaged in unfair, unlawful and deceptive trade practices by

3   engaging in the unfair, deceptive and unlawful business practices outlined in this Class Action

4   Complaint. In particular, Defendant has engaged, and continue to engage, in unfair, unlawful

5   and deceptive trade practices by, without limitation, the following:

6   a.   deceptively representing to Plaintiffs, and those similarly situated, the

7   Product was of a certain quality or standard when it was not;

8   b.   deceptively representing that the Product was ASTM acceptable when, at

9   best, it lacked credible evidence to support those claims, and, at worst, knew the

10   Product would fail prematurely, was not suitable for use as flooring, and otherwise was

11   not as warranted and represented by Defendant;

12   c.   failing to disclose to, or concealed from, consumers, installers, and

13   distributors material facts about the defective nature of the Product;

14   d.   failing to disclose its own knowledge of the defective nature of the

15   Product; and

16   e.   limiting its warranty obligations in an unfair and unconscionable way in

17   light of its failure to disclose the defective nature of the Product.

18   f.   engaging in fraud, deceit, and misrepresentation as described herein;

19   g.   being unjustly enriched, as described herein;

20   221.   Defendant intended that Plaintiffs and the Class members would rely on the

21   unlawful, fraudulent, and/or unfair business acts and practices alleged herein.

22   222.   Plaintiffs and those similarly situated relied to their detriment on Defendant's

23   unfair, deceptive and unlawful business practices. Had Plaintiffs and those similarly situated

24   been adequately informed and not deceived by Defendant, they would have acted differently by

25   not purchasing (or paying less for) Defendant's Product.

26   223.   Defendant's acts and omissions are likely to deceive the general public.

27

224.   Defendant's actions, which were willful and wanton, constitute intentional violations of the Consumer Protection Acts.

225.   Defendant engaged in these unfair practices to increase its profits.

226.   Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by the Consumer Protection Acts.

227.   The aforementioned practices, which Defendant has used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

228.   Plaintiffs seek, on behalf of those similarly situated, full damages, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon. Plaintiffs also seek to recover attorneys' fees, costs, and expenses to be assessed against Defendant, within the limits set forth by applicable law.

229.   Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the unfair trade practices complained of herein.

230.   Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent, and injunctive relief restraining Defendant from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate Consumer Protection Acts, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant is not entitled.

231.    Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the Consumer Protection Acts alleged to have been violated herein.

232.    As a direct and proximate result of such actions, Plaintiffs and the other members of the Classes have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the Classes lost the amount they paid for the Products.

233.    As a direct and proximate result of such actions, Defendant has enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

## TENTH CAUSE OF ACTION
### (Breach of Implied Warranty)

218.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

219.    Plaintiffs and Class members are "buyers" within the meaning of each of their respective State's implied warranty statutes. See, e.g., CAL. CIV. CODE § 1791(b); TEX. BUS. & COM. CODE § 2.103; N.Y.U.C.C. LAW § 2-103; FLA. STAT. § 672.103; 810 ILCS 5/2-103; ILL. REV. STAT., CH. 26, PARA. 2-103.

220.    Lumber Liquidators is a "seller" and the product is a "consumer good" within the meaning of each state's warranty statutes. See, e.g. CAL. CIV. CODE § 1791(a), (l); N.Y.U.C.C. LAW §§ 2-103(1) (d) & 2-105; FLA. STAT. §§ 672.103(1) (d) & 672.105; TEX. BUS. & COM. §§ 2.103(a) (4) & §2.105(a); 810 ILCS 5/2-103; ILL. REV. STAT., CH. 26, PARA. 2-103(1) (d); 810 ILCS 5/2-105; ILL. REV. STAT., CH. 26, PARA. 2- 105.

221.    Lumber Liquidators impliedly warranted to Plaintiffs and the Classes that

the product was "merchantable" within the meaning of e.g. CAL. CIV. CODE §§ 1791.1(a) & 1792; CAL. CIV. CODE § 1791(a); N.Y.U.C.C. LAW § 2-314; FLA. STAT. § 672.314; TEX. BUS. & COM. § 2.314; 810 ILCS 5/2-314; and ILL. REV. STAT., CH. 26, PARA. 2-314. However, the product does not have the quality that a buyer would reasonably expect and was therefore not merchantable.

222.    Lumber Liquidators' product is not fit for the ordinary purposes for which such goods are sold.

223.    Any attempt by Lumber Liquidators to disclaim the implied warranty of merchantability is unenforceable, as the disclaimer failed to mentioned the implied warranty of merchantability and was not conspicuous as required by law, and was both procedurally and substantively unconscionable, rendering it unenforceable.

224.    As a result, Plaintiffs and the Class members were injured through their purchase of non- merchantable products.

225.    Under each state's implied warranty statutes, Plaintiffs and Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of the product, or the overpayment of amounts they paid for the Product.

## ELEVENTH CAUSE OF ACTION
### (Fraud/Non-Disclosure/Concealment)

226.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

227.    As alleged above Lumber Liquidators concealed and suppressed material facts concerning the Product.

234.    Defendant had a duty to disclose facts concerning the inability of the Product to withstand ambient moisture because they were known and/or accessible only to the Defendant, who had superior knowledge and access to the facts, and the Defendant knew they were not

1  known to or reasonably discoverable by Plaintiffs and the Classes. The omitted and concealed

2  facts were material

3      235.    Defendant actively concealed and/or suppressed these material facts, in whole or

4  in part, to protect its profits, and did so at the expense of Plaintiffs and the Classes.

5      236.    Because the omitted facts were material, Plaintiffs and all Class members are

6  entitled to a presumption and would have acted differently – not purchasing Defendant's

7  Product or paying less for it – if the true facts had been disclosed to them. And, in fact,

8  Plaintiffs and the Classes were unaware of these omitted material facts and would not have

9  acted as they did if they had known of the concealed and/or suppressed facts.

10     237.    Plaintiffs' and the Classes' actions were justified. Lumber Liquidators was in

11 exclusive control of the material facts and such facts were not known to the public, Plaintiffs,

12 or the Classes.

13     238.    Because of the concealment and/or suppression of the facts, Plaintiffs and the

14 Classes sustained damage because they purchased flooring products that they would not have

15 purchased.

16                          **PRAYER FOR RELIEF**

17     WHEREFORE, Plaintiffs pray that the Court enter judgment against Defendant, and

18 each of them, and in favor of Plaintiffs, and to award the following relief:

19     1.    Certification of the following classes:

20         a.    A California class and appointing Dana Gold as class representative,

21         b.    A West Virginia class and appointing Tammy Emery as class

22 representative,

23         c.    An Illinois class and appointing Mary Louise Ference as class

24 representative,

25         d.    An Minnesota class and appointing Laura Norris as class representative,

26         e.    A Pennsylvania class and appointing Donald Fursman as class

27 representative, and

1          f.      A Florida class and appointing John Triana as class representative;

2          g.      A National class and appointing all of the named Plaintiffs as class

3 representatives.

4      2.      Appointment of the undersigned as counsel for the proposed Class(es);

5      3.      A declaration that Defendant's actions complained of herein violate the state

6 consumer protection statutes and common law implied warranty and non-disclosure;

7      4.      A declaration that Defendant is financially responsible for notifying all Class

8 Members;

9      5.      Injunctive relief requiring Defendant to replace and/or repair all Products

10 installed in structures owned by the Class;

11      6.      A declaration that Defendant must disgorge, for the benefit of the Class, all or

12 part of its ill-gotten profits received from the sale of defective Product, and/or to make full

13 restitution to Plaintiffs and the Class Members;

14      7.      An award of costs and attorneys' fees, as allowed by law, and/or from a

15 common fund created hereby;

16      8.      Leave to amend to conform to the evidence presented at trial; and

17      9.      Orders granting such other and further relief as may be appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial for all individual and Class claims so triable.

RESPECTFULLY SUBMITTED AND DATED this 3rd day of January, 2020.

ROBINS KAPLAN LLP

By:  /s/ Michael F. Ram, SBN #104805
Michael F. Ram, SBN #104805
Email: mram@robinskaplan.com
ROBINS KAPLAN LLP
2440 West El Camino Real, Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041

1

2                                                Jeffrey B. Cereghino, SBN #099480

Email: jbc@cereghinolaw.com

3          101 Montgomery Street, Suite 1800

San Francisco, California  94104

4          Telephone: (415) 433-4949

Facsimile: (415) 433-7311

5

6          Charles J. LaDuca, *Admitted Pro Hac Vice*

Email:  charles@cuneolaw.com

7          Brendan Thompson, *Admitted Pro Hac Vice*

Email:  brendant@cuneolaw.com

8          CUNEO GILBERT & LaDUCA, LLP

4725 Wisconsin Avenue, NW, Suite 200

9          Washington, DC 200016

Telephone:  (202) 789-3960

10        Facsimile:  (202) 789-1813

11                          *Class Counsel*

12        Beth E. Terrell, SBN #178181

Email: bterrell@terrellmarshall.com

13        TERRELL MARSHALL LAW GROUP

PLLC

14        936 North 34th Street, Suite 300

Seattle, Washington  98103-8869

15        Telephone:  (206) 816-6603

Facsimile:  (206) 319-5450

16

17        Jordan L. Chaikin, *Admitted Pro Hac Vice*

Email:  jordan@chaikinlawfirm.com

18        CHAIKIN LAW FIRM PLLC

1280 University Drive, Suite 600

19        Fort Myers, Florida 33907

Telephone: (239) 470-8338

20        Facsimile: (239) 433-6836

21

22        Michael McShane, SBN #127944

Email:  mmcshane@audetlaw.com

23        AUDET & PARTNERS, LLP

711 Van Ness Avenue, Suite 500

24        San Francisco, California 94102

Telephone: (415) 568-2555

25        Facsimile: (415) 568-2556

26

27        Robert K. Shelquist, *Admitted Pro Hac Vice*

Email:  rkshelquist@locklaw.com

---

LOCKRIDGE GRINDAL NAUEN
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota  55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981

Erica C. Mirabella
Email: erica@mirabellallc.com
132 Boylston Street, 5th Floor
Boston, Massachusetts 02116
Telephone: (617) 580-8270

Charles E. Schaffer, *Admitted Pro Hac Vice*
Email:  cschaffer@lfsblaw.com
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania  19106
Telephone:  (215) 592-1500
Facsimile:  (215) 592-4663

Daniel C. Calvert, *Admitted Pro Hac Vice*
Email:  dcalvert@yourlawyer.com
PARKER WAICHMAN LLP
27300 Riverview Center Blvd., Suite 103
Bonita Springs, Florida 34134
Telephone:  (239) 390-1000
Facsimile:  (239) 390-0055

*Attorneys for Plaintiffs and the Certified Classes*

1

**LOCAL RULE 5-1(I)(3) STATEMENT**

2

Pursuant to Local Rule 5-1(i)(3), I hereby attest that in concurrence to the filing of this

3

document permission was obtained from the signatory, and that I will maintain records to

4

support this concurrence by the signatory subject to this document as required under the local

5

rules.

6

DATED this 3rd day of January, 2020.

7

ROBINS KAPLAN LLP

8

By:  /s/ Michael F. Ram, SBN #104805

9

Michael F. Ram, SBN #104805
Email: mram@robinskaplan.com

10

Susan Brown, SBN #287986
Email: sbrown@robinskaplan.com

11

ROBINS KAPLAN LLC
2440 West El Camino Real, Suite 100

12

Mountain View, CA 94040
Telephone: (650) 784-4040

13

Facsimile: (650) 784-4041

14

15

*Attorneys for Plaintiffs and the Certified Classes*

16

17

18

19

20

21

22

23

24

25

26

27

1

<u>CERTIFICATE OF SERVICE</u>

2

I, Michael Ram, hereby certify that on January 3rd, 2020, I electronically filed the

3

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4

such filing to the following:

5

6

Diane Flannery, *Admitted Pro Hac Vice*
Email:  dflannery@mcguirewoods.com
Bethany Gayle Lukitsch, *Admitted Pro Hac Vice*

7

Email:  blukitsch@mcguirewoods.com
McGUIREWOODS LLP

8

800 East Canal Street
Richmond, Virginia 23219-3916

9

Telephone:  (804) 775-1000
Facsimile:  (804) 775-1061

10

11

David Reidy
Email:  dreidy@mcguirewoods.com

12

MCGUIREWOODS LLP
Two Embarcadero Center, Suite 1300

13

San Francisco, California 94111
Telephone: (415) 844-1969

14

Facsimile: (415) 844-1913

15

16

*Attorneys for Defendant Lumber Liquidators, Inc.*

17

DATED this 3rd day of January, 2020.

18

ROBINS KAPLAN LLC

19

By:  /s/ Michael F. Ram, SBN #104805

20

Michael F. Ram, SBN #104805
Email: mram@robinskaplan.com

21

ROBINS KAPLAN LLP
2440 W El Camino Real, Suite 100

22

Mountain View, CA 94040
Telephone: (650) 784-4040

23

Facsimile: (650) 784-4041

24

*Attorneys for Plaintiffs and the Certified Classes*

25

26

27